**Stanislawa SULKOWSKA, Plaintiff,**

v.

**THE CITY OF NEW YORK, Police Commissioner Howard Safir, Police Officer Charles Daskalakis, and Police Officers "A", "B", and "C", Defendants.**

**No. 99 CIV. 4228(AGS).**

United States District Court,
S.D. New York.

Jan. 24, 2001.

---

John W. Cobb, Tuxedo, NY, for Plaintiff.

City of New York Law Department, Laura Eberstein, Jennifer Rossan, Susan Halatyn, New York City, for Defendants.

### OPINION AND ORDER

SCHWARTZ, District Judge.

Plaintiff Stanislawa Sulkowska ("plaintiff") commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983") and New York state law seeking compensatory and punitive damages arising out of her arrest on charges of criminal possession of a forged instrument in the second degree, forgery in the second degree, criminal simulation, and resisting arrest. Specifically, plaintiff asserted claims against the City of New York, former Police Commissioner Howard Safir ("Safir"), Police Officer Charles Daskalakis ("Daskalakis"), and Police Officers "A", "B", and "C" pursuant to (i) Section 1983 for violations of her constitutional rights arising out of her allegedly false arrest and purported abuse while in custody, and (ii) New York state law for false arrest and imprisonment, assault and battery, malicious prosecution, malicious abuse of process, prima facie tort, negligence and gross negligence. By Memorandum Order dated October 19, 2000, the Court denied plaintiff's motion for partial summary judgment, but granted that portion of plaintiff's motion requesting leave to amend the Complaint to exclude defendants Safir and Police Officers "A", "B", and "C". Following entry of a Joint Pretrial Order dated August 28, 2000, the Court conducted a bench trial on December 12, 13 and 14, 2000. This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a).

### FINDINGS OF FACT

**I. Plaintiff's Background and Her Relationship to the Oasis Bar, its Ownership, and its Liquor License**

Plaintiff is a 75–year old woman residing in New York County. Born in Poland in 1925, she earned a master's degree in economics from a Polish university, married, and had two daughters. (Tr. 354, 356, 359, 390.) She also worked as economic director for a construction company. (Tr. 390.) In 1971, she fled then-Communist Poland with her daughters, traveling to Germany and, in 1973, to the United States. (Tr. 355–58; Plaintiff's Brief Life Story, Pl.Ex. 23.) According to plaintiff, her husband, who remained in Poland when she departed, was subject to aggressive questioning and torture concerning the whereabouts of his family. (Tr. 358, 383; Pl.Ex. 23.) Plaintiff later learned in the 1980s that her husband, whom she had hoped would join her in the United States if and when the Communist government permitted him to leave, had been "murdered" in Poland, which caused plaintiff to suffer depression and related symptoms. (Tr. 291, 382–83; Def. Exs. B–12, B–13.)

When she arrived in the United States, plaintiff spoke no English, and initially worked as a cleaning woman in an office building in Manhattan. (Tr. 358–59; Pl. Ex. 23.) With money she saved, plaintiff went into business for herself, opening a candy store in Queens, which she operated for two years, concurrently with her job as a cleaning woman. (Tr. 360–61, 391.) Following the sale of the candy store, plaintiff operated a Polish restaurant called the Baltic Restaurant, which had locations both in Manhattan and in Queens. (Tr. 361–63, 391–92.) Following the closing of that restaurant, plaintiff operated a bar on First Avenue in Manhattan called the Downtown Beirut bar, or "DBB." (Tr. 393.)

In 1986, plaintiff and her daughters formed a corporation called New Statford Restaurant, Inc. ("New Statford")[1] to serve as owner of a liquor license and lease for a bar establishment called the Oasis ("Oasis"). (Tr. at 365, 396.) That same year, they obtained a liquor license in the corporation's name. (Tr. 242, 394.) The Oasis first was located in Ozone Park, Queens and then on Houston Street in Manhattan. (Tr. 399, Def.Ex. NN.) The bar apparently was closed during 1992 and 1993; however, in 1994, plaintiff and her family found a new location, and the Oasis reopened at 121 St. Mark's Place in Manhattan.[2] (Tr. 365, 396, 399–400.)

At its inception, plaintiff owned 60 percent of the New Statford, and each of her daughters owned 20 percent. (Tr. 246; Def. Ex. OO.) After the bar located on Houston Street was closed in 1992, plaintiff and her daughter Bozina resigned from the corporation, leaving her daughter Barbara with 100 percent ownership of New Statford and the Oasis. (Tr. 248–49, 262–63, 401–02; Def. Ex. L.) However, the bar's liquor license continued to remain in the corporation's name, was the license used by the Oasis when it opened in 1994, and was subsequently renewed, for three years, in 1996. (Tr. 89, 400; Pl.Ex. 20.) Although plaintiff had no ownership interest in the bar after it moved to St. Mark's Place, she continued to assist in its operation. She was frequently on the premises and at times performed managerial duties. (Tr. 36, 225.) Barbara hired a manager, Avi Aharon ("Aharon"), in early 1997, but fired him after one year because he was stealing money from the corporation. (Tr. 229–31, 253; Def. Ex. U.) After being fired, Aharon refused to leave his job, continued to sell liquor from the bar, and caused substantial physical damage to the premises. (Tr. 231; Def. Ex. K–1.)

On March 2, 1998, because of Aharon's activity, Barbara placed the liquor license in the custody of the New York State Liquor Authority ("SLA") for safekeeping.[3] (Tr. 231, 252; Def. Exs. U, SS.) However, Barbara subsequently learned that Aharon had removed the license from safekeeping at the SLA and had reopened the bar without Barbara's consent.[4] (Tr. 231, 254.) On April 1, 1998, at Barbara's request, an SLA inspector accompanied by

---

**1.** The first liquor license obtained by plaintiff stated that the name of the corporation was New "Statford." However, the name of the corporation as reflected in the recent records of the New York State Liquor Authority is New "Stratford." (Tr. 18, 56–57; Def. Exs. BB, CC, FF, II, JJ, PP, NN, T, Z, I–1.)

**2.** From 1994 to 1998, plaintiff and her daughters changed the signs on the bar to reflect both the names "DBB–2" and the "Oasis." (Tr. 249–51, 402.). During a short period of time when the bar had an external manager, the bar may also have done business as the "Zeenu Lounge." (Def.Ex. U.) Between the incidents that led to this action and the date

of this Opinion, the bar has been sold. (Tr. 236.)

**3.** According to the testimony of Philip Hachmeyer ("Hachmeyer"), a beverage control investigator for the SLA called by plaintiff, a licensee may place a license in safekeeping to protect the license while the licensee is away or performing construction on the premises in question for an extended period of time. (Tr. 19.)

**4.** Hachmeyer testified that "a mistake had been made at the Liquor Authority," by which the license had been returned to someone other than the licensee of record. (Tr. 21.)

a police officer of the 9th Precinct of the New York Police Department ("NYPD") went to the Oasis and took custody of the license. (Tr. 22, 232, 254.) Barbara, who was produced by plaintiff, testified that she went to retrieve the original license from safekeeping in late April 1998, but the license had been misplaced. (Tr. 239.) She requested a duplicate license and later received a letter from the SLA dated April 24, 1998 (the "20–day letter") that served as a valid license until the original license was replaced.[5] (Tr. 239, Pl.Ex. 19; Def. Ex. BB.) Barbara further testified that she retrieved the new liquor license from the SLA on an unspecified date in early June 1998.[6] (Tr. 239–40.) She testified that she hung the original liquor license in the Oasis' "service area," an enclosed space in back of the bar, because of concerns that Aharon might try to remove it. (Tr. 234, 241, 258.) All parties agreed at trial that the original license was at the premises when plaintiff was arrested there in the early morning of June 13, 1998.[7] (Tr. at 8, 14, 146, 431.)

## II. NYPD Conditions Unit and MARCHS Task Force

At all times relevant to the instant action, defendant Charles Daskalakis was employed by the NYPD, and was working out of the Department's 9th Precinct as a member of a specially formed unit known as the Street Conditions, or Conditions, Unit (the "Conditions Unit").[8] (Tr. 114, 465.) The Conditions Unit was formed by the NYPD as part of the City's efforts to remove so-called undesirable elements and conditions that had the effect of offending the community at large.[9] Each police precinct apparently has officers assigned to Conditions. The premises targeted by the 9th Precinct's Conditions Unit are "cabaret" locations, meaning "clubs, bars, anywhere there was some kind of liquor sold or any kind of dancing." (Tr. 199.) Officer Rosado, who was called as a witness by defendants, testified that certain premises are identified as community "hot spots" and that the NYPD has a list of such "hot spots." (Tr. 467.) The "hot spots" are locations which have been the subject of complaints or are premises not performing in ways the City deems to be satisfactory, in terms of conditions, in the community. (Tr. 467.) If a location is a "real problem," the goal is to close them down or expel them from the community. (Tr. 468.)

The officers of the Conditions Unit never act on their own with respect to desig-

---

**5.** The letter was addressed to the corporate licensee, and stated that "the license application [of licensee] has been approved as of this date." The letter further stated that "permission to purchase, stock and sell alcoholic beverages is granted." Finally, the letter stated: "This letter will cease to be effective upon the issuance of the license itself or 20 days from the date hereof, whichever is first to occur." (Pl.Ex. 19.)

**6.** Barbara stated she retrieved the new license approximately two weeks after the arrival of the 20–day letter, and that the license was present in the bar on June 3, 4, 12, and 13, 1998. (Tr. 239, 257–58, 260, 270.) Possibly because the license had been misplaced by SLA, SLA records did not indicate that the license had been removed from safekeeping after April 1, 1998. (Tr. 22, 68, 144, 261–62.)

**7.** When asked by the Court to stipulate to this point, however, defendants' counsel refused, and notwithstanding the undisputed fact that the original license was on the premises and

was seized by the NYPD on the date at issue, stated that it was not clear "whether or not the license was in fact still in safekeeping on the date of the incident." (Tr. 184.)

**8.** This Unit, as it operated out of the 9th Precinct, was also known as the "Conditions Team" or "Midnight Community Policing Unit (CPU)." (Tr. 114, 465.) In other precincts, similar units were known as "Cabaret Units." (Tr. 114.)

**9.** Police Officer Jose Rosado ("Rosado") testified that the Conditions Unit was formed to address offensive conditions. He stated as follows:

"Officer Rosado: We've had, for a time we had peddler conditions, unlicensed general vendors, squeegee. Things of that nature. Beer drinking. Urinating in public. Like I said loitering for prostitution. These are like basically, quality of life. Things that would come up. And our commanding officer would have us arrest them." (Tr. 465.)

nated "hot spots"; rather, they act in response to two types of directions. (Tr. 467.) The first, and most common, type of direction is a "a call over the radio, or . . . at the station house directing [officers] to a certain location." (Tr. 466–67, 468.) The second type of direction is a call to action as part of a joint task force formed by the Mayor's office named the Multi–Agency Response to Community Hot Spots, or "MARCHS." (Tr. 32, 456, 469–70.) The MARCHS Task Force is comprised of representatives from various New York City agencies such as the Buildings Department, Consumer Affairs Department, Health Department and Environmental Protection Department, working together with numerous police and vice officers and the SLA. (Tr. 30–31, 470.) The MARCHS Task Force specifically focuses on establishments that have or should have a liquor license, (Tr. 31), and examines the conditions of such establishments, including general cleanliness, food safety, and fire safety. (Tr. 470.) The Task Force works precinct-by-precinct, on the basis of the same lists of community "hot spots" or targets as those held by the Conditions Units alone, lists which were drawn up by the Commanding Officers of each local precinct. (Tr. 29–30, 71, 470; Def. Ex. AA.)

The Conditions Units frequently conduct visits related to a premises' liquor license, so-called "SLA investigations." On investigations triggered by a radio call, the Unit responds with the members of their team from the precinct, which for the 9th Precinct consisted of five or six officers. (Tr. 200–01.) Some or all of the officers travel to the designated location, dressed in uniform or in plain clothes. For a MARCHS visit, which could comprise up to 30 or 40 individuals, the Units provide a uniformed police presence for the representatives of other agencies. (Tr. 30, 469.)

Hachmeyer, a member of the Task Force, testified that "MARCHS" occur every weekend in all boroughs. (Tr. 34.) Requests to participate originate in the Deputy Mayor's office, which determines when and where participants should congregate. (Tr. 32.) "[V]arious agencies would rendevous at the [designated] local precinct . . . on Friday or Saturday night, [have] a briefing schedule that lasts until about midnight, and then [ ] go out in the field." (Tr. 31.) The participants go out on the MARCH in police vehicles, vans, and other agency vehicles to the various listed "target locations," which are "kept secret until the evening of the operation," and are not disclosed in advance to the proprietors of the businesses. (Tr. 32, 33, 469; Def. Ex.˙AA.) Upon arrival, the various agency personnel conduct several investigations, concerning, for example, food quality, building structure, and liquor stock, for approximately 45 minutes to one hour. (Tr. 33.) Such personnel issue summonses to those target premises that fail to conform with applicable regulations. (Def.Ex. AA.)

### III. Closing of the Oasis Bar and Plaintiff's Arrest

From 1994 to June 12, 1998, the date of the incident that is the subject of this action, the Oasis Bar had been cited by the SLA for certain minor violations. In particular, in November 1994, the bar was charged with selling alcohol to a minor, (Tr. 28, 228–29), and at some point thereafter the bar was charged with a noise violation. (Tr. 210–11, 229.) On the early mornings of June 4 and 6, 1998, respectively, the Oasis was issued summonses for failure to display a liquor license and for permitting consumption of alcohol without a liquor license. On the first visit, when the officers asked to see the bar's liquor license, they were shown the 20–day letter, which had expired. They subsequently arrested individuals and removed the bar's liquor inventory from the premises, effectively closing the bar down. (Tr. 117–18, 236–37, 258–61; Pl.Ex. 14; Def. Ex. Z.) No details concerning the specific events of the second visit were presented at trial. Further, on both nights, the original li-

cense, as well as the photocopy, were purportedly on the premises.[10] (Tr. 260, 270.)

By the night of June 12, 1998, the Oasis had clearly been designated by the 9th Precinct as a community "hot spot." [11] (Tr. 467, 469.) On that evening, the 9th Precinct's Conditions Unit was directed to conduct an SLA investigation at the Oasis. (Tr. 93–94, 115.) Daskalakis and the Sergeant Timothy Ferguson ("Ferguson") responded, and later requested backup from two other members of the Unit, Officers Luis Fernandez and Michelle Rodriguez, who joined them at the scene. (Tr. 202.) Daskalakis, who was called as a witness by plaintiff, testified that the purpose of their visit to the Oasis was to ascertain whether the bar "required licensing by the [SLA]," and if so, whether it was licensed and adhered to SLA rules and regulations. (Tr. 100.)

Arriving in plain clothes around midnight, (Tr. 372), Daskalakis and Ferguson identified themselves to the bartender and asked to see the bar's liquor license. (Tr. 93, 102, 104.) The bartender presented them with a color photocopy of the license that was kept in a frame near the cash register located behind the bar. (Tr. 104, 105, 109, 175.) Daskalakis then asked if the owner was present and the bartender motioned towards plaintiff who was sitting at the end of the bar. (Tr. 112). After being informed of the officers' presence, plaintiff approached Daskalakis and asked what he wanted. (Tr. 113.) The officer

stated that he was there to conduct an SLA investigation, (Tr. 124), and the following exchange ensued:

Q: What did she [plaintiff] say?

A: "What do you want?"

Q: What did you say?

A: I said "I need to see your liquor license."

(Tr. 113)

Plaintiff, who had arrived in the United States at age 48 and converses in English with considerable difficulty,[12] apparently understood that Daskalakis wished to see whether the bar had a liquor license, a logical inference. She therefore stated, referring to the photocopy, that "this is my liquor license." (Tr. 124, 408.) Daskalakis testified that he stated that he was being shown a copy and not the original, and that plaintiff three times repeated her statement that the document he had in his hand was "my liquor license." (Tr. 124.) According to the officer, at that point, he went to his vehicle to obtain his summons book and write out a summons for operating a bar without a liquor license, and for failure to display a liquor license. (Tr. 125, 135.) Plaintiff followed him, and again asserted that she had given him "her liquor license." (Tr. 125.) When the officer finally asked for "the original," plaintiff told the officer that she indeed had another license, led Daskalakis back into the bar, produced the original license, and gave it to the officer.[13] (Tr. 126–27, 374.)

---

**10.** Defendants maintain that the SLA license was in safekeeping on June 4, 1998, and presented an internal SLA memorandum in support of their position. (Tr. 259–63; Def. Ex. Z; Def. Post–Trial Mem. at 20 & n. 4.) However, as noted *supra*, the SLA's records with regard to the location of the original liquor license after April 1, 1998 are inconclusive, such that the SLA memorandum has little value with regard to the location of the license.

**11.** It should be noted that the Oasis was subject to a MARCHS Task Force visit in November 1999, during which certain summonses were issued. (Tr. 36–37, 447, 452–53; Def. Ex. AA.) While Rosado testified that, to his

knowledge, the Oasis was not on the list for MARCHS on any date other than the November 1999 date, he affirmed that the Oasis had been placed on a list of "hot spots" by June 13, 1998. (Tr. 469.)

**12.** Plaintiff also has trouble writing in English. She testified that she first wrote a letter that was sent to the Court in Polish, and that the letter was translated into English by a typing service. (Tr. 428; Pl.Ex. 22.)

**13.** Daskalakis testified that even after he told plaintiff that the document he was being shown was a copy, plaintiff insisted that it was the original. (Tr. 133, 134, 178.) The Court finds that this testimony is not credible.

Although the parties dispute where the original license was located on the premises,[14] it is undisputed that Daskalakis then had in his hand both the photocopy and the original. (Tr. 130, 432.) At that point, without inquiring of the SLA as to whether the license was valid,[15] (Tr. 131, 145–46), Daskalakis arrested plaintiff and charged her with two felonies, forgery in the second degree and possession of a forged instrument in the second degree. Daskalakis also charged her with the misdemeanor of criminal simulation. *See* New York Penal Law ("NYPL") §§ 170.10(3), 170.25, 170.45(2). Daskalakis testified that he believed that the Oasis had no valid license and that plaintiff had intended to deceive or defraud him by producing the original license after insisting that the photocopy "is the license." (Tr. 135, 139.) Further, in the course of placing plaintiff under arrest, Daskalakis found her resisting the second handcuff. (Tr. 165.) Notwithstanding the fact that plaintiff's expressions of anger and frustration were understandable and, indeed, justified un-der the circumstances, Daskalakis also charged her with resisting arrest.[16]

Upon plaintiff's arrest, Daskalakis seized both the original and the copy of the Oasis' liquor license. (Tr. 144.) The officers then closed down the bar, vacating it of its patrons and, as was "standard procedure," seizing its liquor stock. (Tr. 158, 162–63, 173; Def. Exs. N–1 to N–4; Affidavit of Stanislawa Sulkowska in Support of Plaintiff's Motion for Summary Judgment, Def. Ex. LLL, ¶ 14; Plaintiff's Brief Life Story, Def. Ex. G at 1, 3.) Daskalakis testified that both the original license and the liquor inventory were removed because he believed that the premises was not licensed. (Tr. 144, 157.) He came to this judgment not because he had checked with the SLA as to the license's validity, but "[b]ecause the premises had been open for business as a licensed premise, and had been issued summonses numerous times for matters regarding the license." (Tr. 157, 161.) Daskalakis also testified that he had been told by two other members of his

At no time did plaintiff state to Daskalakis that the copy was "the original" or use the word "original." (Tr. 139–40.) Rather, in response to the officer's demand for evidence of a liquor license, plaintiff merely asserted that she had given him "the license." (Tr. 137.) Moreover, when Daskalakis finally asked "Do you have the original?", (Tr. 126), plaintiff gave him the original license; and plaintiff testified at trial that she did not consider the photocopy she had presented to be the original license. (Tr. 434.) Further, Daskalakis himself acknowledged, contrary to his previous testimony, that once he had the original, it was clear that plaintiff had not offered the photocopy as that original. (Tr. 133.)

14. Both plaintiff and Barbara testified that the original license was hanging on the wall in the service area at the rear of the bar. (Tr. 234, 374, 436–37.) Daskalakis testified that plaintiff produced the original license from a room behind the bar, accessed via a closed door. (Tr. 129.) However, Daskalakis also acknowledged that there was little light in the bar, and there was "no light" in the room from which plaintiff retrieved the original license. (Tr. 170.)

15. Whether a license is valid, or in force and effect, according to the testimony of James Pizzi of the SLA, called by plaintiff, is a simple fact to determine. He testified as follows:

"Q. When a precinct or some authorized person calls you to ask about the status of a liquor license, how long does it take you to determine what the status is?
A. It varies with the computer and looking for the file and getting the information. But it doesn't take long.
Q. So it is a computer-related search? When they call you to ask—should somebody call you to ask about the status of a license, you then have access to computer records, is that correct?
A. Yes.
Q. To access the records on the computer would take how long? Couple of minutes, five minutes, an hour?
A. Something like that, a few minutes."
(Tr. 81.)

16. Daskalakis also charged plaintiff with two violations of the New York Alcoholic Beverage Control Law ("ABC Law"), for (i) failure to display a liquor license, and (ii) permitting consumption without a liquor license, the same offenses for which the bar had been issued summonses on June 4 and 6, 1998, respectively. (Tr. 150–51, 179, 182.)

Conditions Unit that the license had been revoked. (Tr. 150–51, 155.) To this date, neither the licenses nor the liquor have ever been returned to the Oasis.[17] (Tr. 161, 433.)

Testimony at trial established that the Oasis' liquor license was valid at the time of plaintiff's arrest and has never been suspended, revoked, or canceled. The SLA file offered in evidence by defendants did not indicate a suspension, revocation, or cancellation, and Hachmeyer testified that careful review of the file would have indicated such changes. (Tr. 22.) Barbara also testified that the liquor license was valid and in effect at all relevant times. (Tr. 234, 270.) Further, a letter issued by the State of New York Division of Alcoholic Beverage Control dated June 15, 1998 stated that the "licensee is licensed to sell alcoholic beverages at the referenced address [i.e. 121 Saint Mark's Place]. The license was renewed on May 1, 1996." (Pl.Ex. 20.) Pizzi testified that this letter indicated that the licensee had a "three-year" license which was valid until May 1, 1999. (Tr. 89.) Moreover, the license itself states on its face that it expires on April 30, 1999. (Def.Ex. I–1.) Defendants never called either of the two officers whom Daskalakis stated had told him that they believed that the Oasis did not have a valid license. Thus, all of the evidence, including the testimony of witnesses, the SLA file and the June 15, 1998 letter, strongly supports plaintiff's contention that the liquor license was valid and in effect on June 12 and 13, 1998, and the Court so finds.[18]

**17.** The original license was destroyed by the NYPD's Property Clerk's Office on July 21, 1999. (Def.Ex. M.)

**18.** Despite clear evidence, from defendants' own records and the testimony of multiple witnesses, that the Oasis' liquor license was in force and effect at the time of plaintiff's arrest, defendants' counsel refused to stipulate to this point at trial. (Tr. 183–85.)

**19.** Plaintiff asserted that she was humiliated as a result of being arrested and led out of the

## IV. Plaintiff's Confinement, Release, and Psychological Injury

After she was arrested, plaintiff was forcibly removed from the premises and transported in a police vehicle to the 9th Precinct.[19] (Tr. 174.) While in custody at the 9th Precinct, she was handcuffed to the bars of the holding cell, which plaintiff said caused soreness to her hands. (Tr. 188, 378.) After an extended period of time, plaintiff who suffered from asthma, complained that she "felt very bad." (Tr. 188, 378, 410.) She testified that her initial requests for water and for her asthma medication, which had been confiscated with her other belongings, went unanswered. (Tr. 412–13; Def. Ex. LLL ¶ 15.) At a certain point, Daskalakis reported plaintiff's illness and summoned an emergency medical team. (Tr. 188–90.) Escorted by Daskalakis, plaintiff was transported by ambulance to Bellevue Hospital Center ("Bellevue") where, after seeing a triage nurse, she was referred to the psychiatric ward, cleared, and released back into Daskalakis' custody. (Tr. 190–92, 379, 493; Def. Exs. B–1, B–2.) Still handcuffed,[20] plaintiff was transported back to the 9th Precinct, where she was kept in the holding cell for several hours. (Tr. 192, 379–80.) Thereafter, plaintiff was transferred to central booking,[21] arraigned, and then finally released from custody in the afternoon of June 13, 1998. (Tr. 192, 411; Def. Ex. LLL ¶ 19.) On September 2, 1998, all charges against plaintiff were dismissed in the Criminal Court of the City of New York upon the motion of the District Attorney. (Pl.Ex. 22; Tr. 195–96.)

bar in the presence of patrons. (Tr. 318; Def. Ex. LLL ¶ 14; Def. Ex. G at 1.)

**20.** Plaintiff testified that she was humiliated by being in handcuffs while present at the hospital. (Tr. 378–79.)

**21.** Plaintiff testified that, at central booking, she suffered further humiliation from being placed in a cell with other, younger detainees, who insulted her. (Tr. 379–80.)

On June 11, 1999, plaintiff filed the instant action.

## CONCLUSIONS OF LAW

### I. Section 1983 Claims [22]

 Section 1983 authorizes a party who has been deprived of a federal right under the color of state law to seek relief through "an action at law, suit in equity, or other proper proceeding for redress." *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 707, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). The statute creates no substantive rights, but "provides remedies for deprivations of rights established elsewhere." [23] *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion). A Section 1983 claim has two essential elements: (i) the defendant acted under color of state law; and (ii) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges. *See Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998) (citation omitted). In order to satisfy the second element, plaintiff must establish that defendants acted either intentionally or recklessly; if defendants acted merely negligently they cannot be held liable. *See Dewick v. Village of Penn Yan,* 972 F.Supp. 166, 169 (W.D.N.Y.1997).

In this case, the first element is undisputed, because the actions about which plaintiff complains were committed by Officer Daskalakis, who, as a police officer in the course of duty, clearly acted under color of state law. *See West v. Atkins,* 487 U.S. 42, 49–50, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citing *Monroe v. Pape,* 365 U.S. 167, 172, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)) ("It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State."); *Parratt v. Taylor,* 451 U.S. 527, 535–36, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (finding that a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law). The following discussion, therefore, will focus on the second element.

---

**22.** Plaintiff claims that Officer Daskalakis deprived her of her First Amendment rights by arresting her for protesting his unlawful seizure of the Oasis' liquor license. (Amend. Compl.¶¶ 10, 11, 22.) "Adverse government action taken in retaliation for the exercise of protected speech violates the First Amendment." *Barber v. Winn,* No. 95 CV 1030, 1997 WL 151999, at *3 (N.D.N.Y.1997) (citing *Mozzochi v. Borden,* 959 F.2d 1174, 1179 (2d Cir.1992)). To properly plead such a claim, a plaintiff must allege and prove (i) that her speech was protected by the First Amendment, i.e., involved a matter of public concern, and (ii) that there was adverse government action taken in retaliation for the exercise of such speech. *See, e.g., Brady v. Town of Colchester,* 863 F.2d 205, 217 (2d Cir.1988) (citing *Mount Healthy v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Whether speech is a matter of public concern is a question of law to be determined by examining the "content, form, and context of a given statement, as revealed by the record." *Sheppard v. Beerman,* 18 F.3d 147, 151 (2d Cir.1994) (quoting *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). In this case, plaintiff's alleged speech, which consisted of her objection to the seizure of her bar's liquor license, is not a matter of public concern, and even assuming it was such, plaintiff failed to establish that she was arrested in retaliation for such comments. Accordingly, the Court declines to find a violation of plaintiff's First Amendment right to free speech.

**23.** The statute provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

## A. Fourth Amendment Claims

Plaintiff asserts that Daskalakis violated her Fourth Amendment rights because he arrested her without probable cause, and used unconstitutionally excessive force on her during the arrest. (Amend. Compl.¶ 22.) Specifically, she alleges that "[i]n response to her protest and without probable cause, she was arrested, manhandled, assaulted and battered, dragged from the premises in handcuffs, [and] handcuffed to the bars of a holding cell at the 9th Precinct," and challenges each of the charges that were brought against her. (*Id.* ¶¶ 11, 15.)

### 1. False Arrest

■■■ "A Section 1983 claim for false arrest rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). To establish a claim for false arrest under federal or New York law, the plaintiff must show that " '(i) the defendant intended to confine [the plaintiff], (ii) the plaintiff was conscious of the confinement, (iii) the plaintiff did not consent to the confinement, and (iv) the confinement was not otherwise privileged.' " *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (citation omitted). An arrest is justified, or otherwise privileged, if there was probable cause to arrest. *See Curley v. AMR Corp.,* 153 F.3d 5, 13 (2d Cir.1998) (stating that "otherwise privileged" confinement in-

cludes arrest with probable cause); *Weyant, supra,* 101 F.3d at 852 ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983.") (citation and internal quotations omitted). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant, supra,* 101 F.3d at 852. There is no dispute that Officer Daskalakis intended to arrest plaintiff, and that plaintiff was aware of and did not consent to her confinement. Rather, defendants contended at trial that plaintiff's false arrest claim must fail because Officer Daskalakis had probable cause to arrest plaintiff. The Court disagrees.

■■■ The Court finds that Officer Daskalakis lacked probable cause to arrest plaintiff for any crime on the night of June 12 and 13, 1998.[24] Because the two violations for which plaintiff was charged under the ABC Law are not crimes,[25] the Court focuses on the felonies of forgery in the second degree and criminal possession of a forged instrument in the second degree, and the derivative misdemeanor charge of criminal simulation. Each of these three offenses involves the "intent to defraud,

---

**24.** Despite the suggestion in their post-trial damages memorandum that plaintiff could have been charged with some crime other than those with which she was charged, (Def. Post-Trial Mem. at 24 n. 6), defendants presented no evidence at trial that would indicate that Officer Daskalakis believed, or could have believed, that plaintiff had committed, or was about to commit, any crime.

**25.** Even if these were offenses for which plaintiff could have been arrested, (Tr. 147), Daskalakis had no probable cause to arrest plaintiff for either, because plaintiff was neither the holder of the license nor the operator of the bar. *See* ABC Law § 114.6 (requiring

the holder to post a liquor license in a conspicuous place before doing business); ABC Law § 64–b (prohibiting the operator of a bar to serve liquor without a license). Moreover, although the bartender gestured to plaintiff when Daskalakis asked for the owner, neither he nor any other officer asked plaintiff if she was the owner or operator, and SLA records clearly indicated that person to be Barbara. (Def.Ex. Z.) Nor did the officers ask her if she had posted the original license. Thus, it would not have been reasonable for Daskalakis to conclude that she was holder of the license or the owner of the bar in order to justify an arrest based on the above sections.

deceive, or injure another." *See* NYPL §§ 170.10(3), 170.25, 170.45(2).[26]

At trial, Daskalakis testified that he inferred plaintiff's intent to defraud from her alleged attempt to pass off the photocopy of the Oasis' liquor license as the original. He stated that "initially I was playing the devil's advocate, and I was saying, 'maybe she really thinks that this photocopy is the original, because she was so adamant that the photocopy was the original.'" (Tr. 135.) However, "[w]hen she eventually gave me the original copy of the license, when she saw that she was going to be issued a summons, and now she changed her story from the fact the document that I had was the license to now that she has [another] license, she was purporting it all along to be the original license. And it was my belief that there was no license on the premises." (Tr. 139; *see also* Tr. 149.)

Daskalakis' explanation is contradicted by his own testimony concerning his interaction with plaintiff and her ability to understand his requests. Plaintiff's repeated reference to the photocopy as "her license" does not equate to "purporting it . . . to be

the original license," because plaintiff never stated that it was such and, at the time of this exchange, the officer had not yet requested the original. *See* note 13, *supra*. Plaintiff assumed, as anyone would, that the police inquiry had to do with whether the Oasis had a valid license, one that was in force and effect. When plaintiff answered Daskalakis' question by stating "this is my license," she was responding truthfully. The photocopy showed that the Oasis had a license. Moreover, when plaintiff finally understood that Daskalakis wished to see the original—a realization that came in response to Daskalakis' question, "Do you have the original?"—she led him into the bar and produced it for him. (Tr. 126–29, 432.) Daskalakis interpreted plaintiff's realization as evidence that she "knew [the license she had given him] was a photocopy," (Tr. 141), and as clear proof that she had been trying to deceive him by presenting the copy.[27] But, in actuality, it was plaintiff who was fooled, because she failed to comprehend the exact nature of Daskalakis' initial request. In arresting plaintiff, the officer disregarded the fact that she spoke extremely poor English,

---

**26.** Section 170.10(3) states:

"A person is guilty of forgery in the second degree when, *with intent to defraud, deceive or injure another,* he falsely makes, completes or alters a *written instrument* which is or purports to be, or which is calculated to become or to represent if completed . . .(3) [a] written instrument officially issued or created by a *public office, public servant or governmental instrumentality.*" NYPL § 170.10(3) (McKinney's 1999) (emphasis added).
Section 170.20 states:
"A person is guilty of criminal possession of a forged instrument in the third degree when, with knowledge that it is forged and *with intent to defraud, deceive, or injure another,* he utters or possesses a forged instrument."
NYPL § 170.20 (McKinney's 1999) (emphasis added).
Section 170.45 states:
"A person is guilty of criminal simulation when . . . 2. With knowledge of its true character *and with intent to defraud,* he utters or possesses an object so simulated."

NYPL § 170.45(2) (McKinney's 1999) (emphasis added).

**27.** The premise upon which Daskalakis based his ultimate inference of plaintiff's intent, namely that plaintiff had originally expressed the opinion that the photocopied license was the original, is flawed. Since plaintiff had never so insisted, her production of the original license would not have indicated to a reasonable officer that plaintiff had been trying to deceive him. In fact, her production of the original was no more an attempt to defraud or deceive than her production of the photocopy—which was completely honest and reasonable. The mere fact that plaintiff knew the license she had presented to be a photocopy does not indicate that she intended to pass that license off as the original. And the only violation attendant to displaying a photocopy of a license arises in the event that the original license is not conspicuously displayed. While there is an issue as to whether the placement of the original was conspicuous, this only implicates the charged violation of failure to display a liquor license, not the charge of forgery, a felony.

and had trouble understanding what he wanted her to produce.

During the interrogation Daskalakis recounted at trial, he demanded the liquor license several times, and had to explain repeatedly why he wanted the license and why he insisted on removing the original and copy after both had come into his possession. (Tr. 124–26, 171, 176, 178, 432–33.) At a certain point, when Daskalakis was at his vehicle in the process of writing plaintiff a summons, it apparently occurred to him that plaintiff was having trouble comprehending him, as plaintiff had twice again asserted that the officer had "her license." Daskalakis then finally demanded "the original"; plaintiff told him that it was in the bar, and the original was produced. (Tr. 126–29.) Nevertheless, Daskalakis testified at trial that he was not aware that plaintiff's native language was not English. He insisted that "[t]here was no language problem. If [plaintiff] did not understand me, she never made it known to me. And I understood her perfectly." (Tr. 137.) The Court declines to credit this testimony, given the interaction Daskalakis described. Plaintiff's testimony at trial further reflected her extreme difficulty in English expression and comprehension. She came to the United States at age 48 with no knowledge of English, speaks with a heavy accent and in incomplete sentences, often mistakenly employs pronouns and prepositions, and enunciates in an irregular manner, with intermittent pauses within sentences as she forms her thoughts. She appears to have trouble understanding English as well, and many of the examining attorneys' questions had to be repeated to her or rephrased. Moreover, even after such questions were rephrased, plaintiff's responses often demonstrated that she had failed to comprehend the question that had been asked. (*See, e.g.,* Tr. 355, 359, 363–64, 366, 376–83, 396–97, 401, 412, 415–16, 424–25.)

Daskalakis' testimony concerning the purported invalidity of the Oasis' liquor license is also relevant to the Court's find-ing that he lacked probable cause, and to its ultimate finding concerning the importance of plaintiff's arrest to the Condition Unit's goals. Despite the fact that the license's validity or invalidity is irrelevant to a determination of forgery or criminal simulation, a fact acknowledged by Daskalakis, (Tr. 147, 179), the officer's unsupported conclusion that the license was invalid apparently supported his decision to arrest plaintiff. The officer testified at trial that when he entered the bar that night, he neither knew where the license was nor if it was valid, but stated that two of his colleagues on the Conditions Unit had told him that the license was invalid. (Tr. 103, 150–51, 155.) Despite the existence of ambiguous data surrounding the location of the license and its validity, and the statement on the face of the license that it expired in 1999, Daskalakis testified that he relied on the other officers' alleged statements for the conclusion that the license was not valid. (Tr. 150, 154–55). This judgment, the officer testified, became part of the basis for his arrest of plaintiff. (Tr. 139, 144.) Moreover, Daskalakis did not inquire of the SLA as to the validity of the Oasis' liquor license before arresting plaintiff, an investigation which, as Pizzi testified, would only have taken a few minutes. (Tr. 130, 145–47.) He simply arrested plaintiff for forgery, seized the licenses, and sanctioned the removal of the bar's liquor inventory. (Tr. 147–48, 157, 160–61.) Such actions suggest that plaintiff's mere presentation of the photocopy, and the officer's unsupported belief that the liquor license was invalid, were Daskalakis' principal rationales for plaintiff's arrest, rather than a belief that plaintiff had attempted to defraud him. *See* note 42, *infra.*

In sum, plaintiff has established by a preponderance of the credible evidence that there was no reasonable basis for Officer Daskalakis' alleged belief that plaintiff intended to deceive or to defraud him. Thus, the Court finds, the officer acted intentionally, and without probable

cause, in falsely arresting plaintiff on charges of forgery or criminal simulation, thus depriving her of her Fourth Amendment rights.[28] Moreover, because the officer had no probable cause to arrest plaintiff, he likewise lacked probable cause for the charge of resisting arrest. Under New York law, "[a] person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an *authorized* arrest of himself or another person." NYPL § 205.30 (emphasis added). Accordingly, an unauthorized arrest will bar a charge of resisting arrest. *See People v. Jensen,* 86 N.Y.2d 248, 253, 630 N.Y.S.2d 989, 654 N.E.2d 1237 (1995). Because plaintiff's arrest was unauthorized, Daskalakis did not have probable cause to arrest her for resisting arrest.

## 2. Excessive Force

Allegations of excessive force during arrest should be analyzed under the Fourth Amendment guarantee against unreasonable seizures of the person, and are analyzed under that Amendment's "reasonableness" standard rather than a substantive due process standard. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The inquiry is whether the officers' actions are " 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865 (quoting *Scott v. United States,* 436 U.S. 128, 137–39, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996); *cf.* NYPL § 35.30 (McKinney's 1999) (stating that an officer "may use physical force when and

to the extent he reasonably believes such to be necessary to effect the arrest"). The "reasonableness" of a particular use of force must be judged from the perspective of "a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation. *See Graham, supra,* 490 U.S. at 396–97, 109 S.Ct. 1865.

Although he effected an unlawful arrest, Daskalakis' actions in restraining plaintiff, placing her in handcuffs, and then placing her in the police vehicle for transport to the 9th Precinct were not, as a matter of procedure, unreasonable under the circumstances. It was not facially unreasonable to restrain plaintiff's arms and place her in handcuffs, even though she was of advanced age. Officer Rosado testified that "there is no specific guideline telling or explaining to us how to handcuff a[sic] elderly person," and that police officers always handcuff a defendant in an arrest situation, "for [their] own safety and the safety of the other officers." (Tr. 480.) While testimony at trial reflected that plaintiff was crying and yelling both before, during, and after her arrest, plaintiff's sole allegations with regard to force employed during the arrest were that (i) the handcuffs were tight, and (ii) that she was pushed or dragged out of the bar and to the police car. (Tr. 377–78; Amend. Compl. ¶ 11.) Handcuffs, however, are inherently tight on the wrists, and Daskalakis testified that "99 percent of [persons] I have arrested has complained that their handcuffs are too tight," and that it is his

---

**28.** At trial, Daskalakis also insisted that he had probable cause to arrest for forgery because plaintiff had "falsely made" the liquor license, i.e. "put it in a copy machine and made it." (Tr. 142.) Specifically, he asserted that he came to the conclusion that plaintiff made the original because plaintiff had possession of both documents. (Tr. 141, 178.) Given that (i) there was no evidence indicating that plaintiff had made the photocopy, (ii)

the officer never asked plaintiff if she had made the photocopy, and plaintiff never so stated, and (iii) the officer never asked plaintiff if she was the owner of the bar, and, in any case, knew or should have known that plaintiff was not the owner, there was no basis for the officer's belief that plaintiff herself had made the copy. Testimony at trial indicated that Barbara made the photocopy. (Tr. 434.)

practice to check the tightness of the grip "if someone complains that the handcuffs are too tight." (Tr. 193.) Further, any possible implication of excessive force as plaintiff was led to the police vehicle is contradicted by the testimony of Officer Daskalakis, who stated that she was not kept in the street before being placed in the vehicle, (Tr. 174), and by Officer Fernandez, who stated that while she was in handcuffs, plaintiff "was screaming and cursing" and herself "didn't allow the officer to lead her to the patrol car," (Tr. 205.); *cf. Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973) (finding, in the context of the Eighth Amendment, that *de minimis* use of force, such as a push or shove, does not rise to the level of a constitutional violation).

## B. Claims Arising Out of Plaintiff's Alleged Abuse While in Custody

 In the Amended Complaint, plaintiff asserts a violation of her constitutional rights as a result of her purported physical abuse and the denial of medical attention while in custody at the 9th Precinct, which allegedly caused her to suffer "physical and mental injury, pain, humiliation and emotional distress, in addition to loss of liberty." (Amend.Compl.¶ 13.) These allegations reflect an alleged deprivation of plaintiff's Fourteenth Amendment rights, which protects pretrial detainees from punishment without due process.[29] *See Bell v. Wolfish*, 441 U.S. 520, 535–36, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

The Supreme Court has held that the state assumes some responsibility for an individual's safety and general well-being when it takes a person into custody against his will. *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Under such circumstances, it is the "State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *Id.* The Government is entitled to restrain a detainee's freedom in order to effectuate detention, e.g. confining them to a facility and restricting the detainee's movement, but such confinement may not rise to the level of "punishment." *See Bell, supra*, 441 U.S. at 535–36, 99 S.Ct. 1861. However, the Supreme Court has noted that "the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" *Id.* at 537, 99 S.Ct. 1861. The Second Circuit has recognized that the Due Process Clause protects a pretrial detainee from the use of excessive force, *see, e.g., Brown v. Doe*, 2 F.3d 1236, 1242 (2d Cir.1993), and from the failure to provide adequate medical attention, *see, e.g., Bryant v. Maffucci*, 923 F.2d 979, 984 (2d Cir.1991).

 The protections of the Due Process Clause are at least as great as those of the Eighth Amendment. *See Revere,*

---

**29.** The Amended Complaint fails to state that plaintiff's Fourteenth Amendment rights were violated. However, it does assert a violation of her Eighth Amendment right to be free from cruel and unusual punishment. (Amend.Compl.¶ 22.) The Joint Pretrial Order and plaintiff's Pretrial Statement of Elements are devoid of allegations under any specific constitutional amendment. While the Court considers plaintiff's allegations of abuse while in custody under the Fourteenth Amendment, and declines to find a violation thereof, it notes that a pretrial detainee is not protected by the Eighth Amendment's prescription against cruel and unusual punishment because such a detainee has not been convicted of a crime. *See Graham, supra*, 490 U.S. at 395 n. 10, 109 S.Ct. 1865; *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Bailey v. Tricolla*, No. CV 94–4597, 1996 WL 733078, at *2 (E.D.N.Y. Dec. 11, 1996) ("For pre-adjudication punishment claims, the relevant constitutional provision is not the Eighth Amendment but the Due Process Clause of the Fourteenth Amendment.").

*supra,* 463 U.S. at 244, 103 S.Ct. 2979. In order to establish a constitutional violation under the Fourteenth Amendment, a plaintiff must at a minimum show that defendants exhibited grossly negligent conduct. *See Bryant, supra,* 923 F.2d at 984 (noting that the standard for due process claims against individual defendants under Section 1983 is still unclear, except that mere negligence is insufficient to state a viable claim). The Second Circuit has required a plaintiff to establish that the defendants "had reason to know of facts creating a high degree of risk of physical harm [to plaintiff] and deliberately act[ed] or fail[ed] to act in conscious disregard or indifference to that risk." *Id.* at 985; *Bailey, supra,* 1996 WL 733078, at *3. In this case, plaintiff failed to establish at trial that she was at risk of physical harm at any time during her confinement, or that, if there were a risk, that defendants acted in conscious disregard or indifference thereto.

Specifically with regard to excessive force, despite the allegation in the Amended Complaint of physical abuse while in custody, plaintiff introduced no evidence of such abuse at trial so as to suggest that plaintiff was punished beyond her mere confinement. The only allegation of harm against her while in custody is the fact that she was handcuffed to the bars of the holding cell. Specifically, plaintiff testified that "the handcuffs were tight," that her hands were sore and swollen, and that she was chained "higher than I can keep my hands." (Tr. 378, 412.) She also complained that Daskalakis did not remove her handcuffs at Bellevue, that her legs were swollen upon placement in the cell of at central booking, and that she had no place to sit in the cell. (Tr. 378–80.) These allegations are insufficient to establish an excessive force claim, because they do not indicate that plaintiff was subject to a high degree of risk of serious harm, or in fact,

that plaintiff was at risk of any harm at all. Moreover, there was no evidence of any grossly negligent, or willful, actions involving force on the part of the officers. It is particularly telling that, according to plaintiff, the officers "didn't want to hurt me, you know, during this time." (Tr. 413.) Plaintiff's restraint by handcuffs was merely an incident of her detention, and does not amount to the type of punishment that violates the Fourteenth Amendment. *See Bell, supra,* 441 U.S. at 539, 99 S.Ct. 1861 ("In the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but.an incident of a legitimate nonpunitive governmental objective.").

The same is true with regard to plaintiff's allegations regarding her denial of medical attention, as plaintiff failed to establish that defendant disregarded a serious risk to plaintiff's health. While Daskalakis may have denied plaintiff's initial requests for water, and for her asthma medication, this at most amounts to mere negligence; the officer called for emergency medical assistance immediately when plaintiff appeared ill and requested a doctor.[30] (Tr. 188, 378.) Moreover, testimony at trial reflected that plaintiff's medical condition was far from serious. Emergency Medical Technician ("EMT") Konstantino Skamalos ("Skamalos"), produced by defendants, testified that upon his arrival at the precinct, he immediately examined plaintiff, who complained of "general malaise" but "denie[d] . . . any pain or discomfort." (Tr. 488, 490.) According to Skamalos, his practice is to write down all of his observations concerning a plaintiff's medical condition, and according to his report, plaintiff neither complained of an asthma attack, nor did Skamalos observe symptoms of such an attack. Plaintiff was taken by ambulance "without incident" to

---

30. Plaintiff testified that she was ignored by the officers in the precinct for "many, many, many hours." (Tr. 413.) However, Daskalakis testified, based on the notations he had recorded in his memo book, that the longest time plaintiff could have been without medical attention was two-and-one-half hours. (Tr. 188–89.)

Bellevue, where she was treated and cleared, with the doctors reporting no injuries. (Tr. 190–92, 379, 490; Def. Ex. B–1.) The testimony at trial reflected the fact that plaintiff, on the whole, received prompt and effective medical treatment falling well within the requirements of the Fourteenth Amendment. *See Revere, supra,* 463 U.S. at 245, 103 S.Ct. 2979. The fact that plaintiff may disagree with certain aspects of that treatment, specifically her referral to the psychiatric ward, does not give rise to a cause of action. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998); *Muhammad v. Francis,* No. 94 Civ. 2244, 1996 WL 657922, at *6 (S.D.N.Y. Nov. 13, 1996).

Accordingly, the Court finds that plaintiff has failed to establish a violation of her Fourteenth Amendment rights. At best, plaintiff's claim is one of simple negligence which is insufficient to state a viable claim under Section 1983. *See City of Canton v. Harris,* 489 U.S. 378, 388 n. 8, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Bryant, supra,* 923 F.2d at 985; *see also Daniels v. Williams,* 474 U.S. 327, 331–33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (lack of due care does not constitute the sort of abusive government conduct that the due process clause was designed to prevent).

## II. Qualified Immunity

■ Although plaintiff has established a violation of a constitutional right, Officer Daskalakis may still avoid liability on the ground of qualified immunity. "[Q]ualified immunity is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment." [31] *Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996). It protects state officials from civil liability for damages when they perform discretionary functions and their conduct does not violate any clearly established federal statutory or constitutional rights of which a reasonable person would

have known. *See Cook v. Sheldon,* 41 F.3d 73, 77–78 (2d Cir.1994) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "It is now far too late in our constitutional history to deny that a person has a clearly established right not to be arrested without probable cause." *Id.* (citing *Soares v. State of Connecticut,* 8 F.3d 917, 920 (2d Cir.1993)).

■ "Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (citations omitted). If an officer arrests the plaintiff without probable cause, the officer is immune from suit if he can show either that: (i) it was objectively reasonable for him to believe he had probable cause; or (ii) officers of reasonable competence could disagree whether probable cause existed. *See Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991); *see also Lennon, supra,* 66 F.3d at 420. The simple fact that a defendant acted in good faith is not enough to entitle him to qualified immunity. *See Duchesne v. Sugarman,* 566 F.2d 817, 832 (2d Cir.1977); *Alvarez v. Abreau,* 54 F.Supp.2d 335, 341 (S.D.N.Y.1999).

■ Here, the Court finds neither that it was objectively reasonable for Daskalakis to believe he had probable cause to arrest plaintiff, nor that officers of reasonable competence could disagree on the issue. As discussed *supra,* an individual is only guilty of forgery, criminal possession of a forged instrument, or criminal simulation if they intended to defraud or deceive the State of New York. It is unequivocally clear from the facts of this case that plaintiff was not trying to defraud the State by insisting that the Oasis had a

---

**31.** Daskalakis asserted the affirmative defense of qualified immunity in his answer. (Answer of Defendant Charles Daskalakis dated Nov. 9, 1999 ¶ 38.)

liquor license, and asserting that the photocopied license was "her liquor license." No reasonable officer would have determined that it was so, and no officers of reasonable competence in the relevant penal laws would disagree on the issue. Officer Rosado, for example, testified that he would not arrest an individual for a felony if she presented a photocopy of a liquor license to an officer, and subsequently provided the original; likewise, he averred that an individual would not be guilty of a crime under an analogous situation where she presents a photocopy of a valid driver's license to an officer and subsequently produces the original license.[32] (Tr. 476–79.) The Court therefore declines to find that Daskalakis is entitled to qualified immunity.

### III. State Law Claims [33]

#### A. Assault and Battery

 Plaintiff asserts a claim for assault and battery arising out of her arrest by Officer Daskalakis, because she was "handcuffed and forcibly placed in the police car [and] imprisoned at the station house overnight." (Pl. Pretrial Stmt. of Elements at 4.) An assault is "an intentional placing of another person in fear of imminent harmful or offensive contact"; a battery is "intentional wrongful physical contact with another person without consent." *Lederman v. Adams,* 45 F.Supp.2d 259, 268 (S.D.N.Y.1999) (quoting *Charkhy v. Altman,* 252 A.D.2d 413, 678 N.Y.S.2d 40, 41 (1st Dep't 1998)) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105 (2d Cir.1993)). If an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest. *See Johnson v. Suffolk County Police Dep't,* 245 A.D.2d 340, 665 N.Y.S.2d 440, 440 (2d Dep't 1997) (holding that a police officer committed a battery when he touched the plaintiff during an unlawful arrest) (citing *Budgar v. State of New York,* 98 Misc.2d 588, 414 N.Y.S.2d 463, 466 (1979) (finding that "since the arrest was unlawful, a technical assault and battery occurred when the claimant was handcuffed and forcibly placed in the State police car")); *Nelson v. Town of Glenville,* 220 A.D.2d 955, 633 N.Y.S.2d 222, 223 (3d Dep't 1995) (affirming lower court's directed verdict for false arrest and battery resulting from false arrest when officers made contact with minor as they attempted to gain entry into her father's house to execute arrest warrant for her father, handcuffed minor, charged her with obstructing governmental administration, detained her for one hour at police station, and did not oppose motion to dismiss charges against minor); *Pawloski v. State,* 45 Misc.2d 933, 258 N.Y.S.2d 258, 265 (1965) (finding assault and battery arising out of false arrest where plaintiff "was touched by the State Police"). Because plaintiff's arrest was unlawful in this case, the Court finds that Daskalakis is liable for an assault and battery on plaintiff, because, without her consent, he placed his hands on her, handcuffed her, and placed her into his police vehicle during the course of the unlawful arrest.

#### B. Malicious Prosecution and Abuse of Process

 To establish a claim for malicious prosecution under New York law, a plain-

---

32. While it is true that Rosado testified that the individual would be guilty of "some type of crime," his judgment was based on the incorrect assumption that the mere photocopying of a valid liquor license is a forgery. (Tr. 472–73; 478.) This assumption reflects the officer's lack of reasonable competency with regard to the relevant sections of the ABC Law. *See* page 48 *infra.*

33. Plaintiff's state law false arrest claim was treated in concert with her federal false arrest claim. In addition, plaintiff's Amended Complaint asserts state law claims for prima facie tort, negligence, and gross negligence. (Amend.Compl.¶ 27.) Because none of plaintiff's submissions treated these claims, and no facts were presented at trial indicating that plaintiff intended to establish them, the Court declines to consider the claims in this Opinion.

tiff must show that (i) the defendant initiated a prosecution against the plaintiff, (ii) the defendant lacked probable cause to believe the proceeding could succeed, (iii) the defendant acted with malice, and (iv) the prosecution was terminated in the plaintiff's favor. *See Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999). The Court finds that Officer Daskalakis is liable for malicious prosecution.

■ Treating the first, third and fourth elements: Daskalakis initiated a prosecution against plaintiff by filing charges against her in a felony complaint. (Def.Ex. VV); *see, e.g., Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (finding that a reasonable jury could find officer initiated prosecution by filing certain charges against plaintiff and merely playing a role in the filing of others); *Vitale v. Hagan*, 132 A.D.2d 468, 517 N.Y.S.2d 725, 726 (1st Dep't 1987) (discussing malicious prosecution initiated by police officer in reaction to involvement in traffic accident with motorist); New York Criminal Procedure Law § 100.05 (stating that criminal action is commenced by filing of a felony complaint); *cf. Dickerson v. Monroe County Sheriff's Dep't*, 114 F.Supp.2d 187, 190 (W.D.N.Y.2000) (finding that where officer was actively involved in the case against plaintiff, the fact that he did not prepare and sign charging information and that county sheriff's office initiated charges did not insulate officer from liability with respect to malicious prosecution claim). Because, as discussed *supra*, probable cause to arrest plaintiff was clearly lacking, the Court also finds that Daskalakis lacked probable cause to believe that the criminal proceeding against plaintiff could succeed. *See Posr, supra*, 180 F.3d at 417. Finally, because the charges were dismissed in their entirety and with prejudice by the District Attor-

ney, the prosecution was terminated in plaintiff's favor.[34] (Pl.Ex. 22.); *see Posr, supra*, 180 F.3d at 418 (stating that "a prosecution is only deemed to terminate in favor of the accused if its final disposition is such as to indicate the innocence of the accused.") (citation omitted).

■ The third element, the issue of malice, requires a more searching examination in this case. The malice that need be proven in a malicious prosecution claim "'does not necessarily involve spite, hatred, malevolence, or a corrupt design; it is sufficiently established by showing that the baseless suit was instituted from any improper and wrongful motive.'" *Brault v. Town of Milton*, 527 F.2d 730, 739 (2d Cir.1975) (en banc) (quoting *Sparrow v. Vermont Sav. Bank*, 95 Vt. 29, 33, 112 A. 205, 207 (1921)); *see also Nardelli v. Stamberg*, 44 N.Y.2d 500, 502, 406 N.Y.S.2d 443, 377 N.E.2d 975 (1978) (stating that malice requires a showing that the prosecutor acted "due to a wrong or improper motive, something other than a desire to see the ends of justice served"). Further, while the absence of probable cause may bear on the malice issue, the two remain independent elements of a malicious prosecution action. *See Martin v. City of Albany*, 42 N.Y.2d 13, 17, 396 N.Y.S.2d 612, 364 N.E.2d 1304 (1977); *see also Brault, supra*, 527 F.2d at 739–40 & n. 6. Only where probable cause to initiate a proceeding is "so totally lacking" may malice reasonably be inferred. *Martin, supra*, 42 N.Y.2d at 17, 396 N.Y.S.2d 612, 364 N.E.2d 1304.

Daskalakis' testified at trial that he was not angry or upset by plaintiff's conduct, (Tr. 176), and that at the time of the arrest and prosecution, he maintained a good faith belief that plaintiff had committed a forgery, (Tr. 135, 139, 178). While it is

---

**34.** Defendants assert, citing the transcript of the criminal court proceeding, that the proceeding was not terminated in plaintiff's favor because the District Attorney stated that "defendant [i.e. plaintiff here] cleared up the problem." (Def. Post–Trial Mem. at 17–18; Def. Ex. MMM.) However, the Court finds that this statement is a clear indication of the innocence of plaintiff on the charges brought against her, because it implies that there was no basis for the prosecution of such charges.

clear that the officer did not act with evil intent or corrupt design, Daskalakis' further testimony indicated that he acted on the basis of a collateral objective. In particular, the Court concludes that plaintiff's arrest—like the arrest of other individuals at the Oasis on June 4, 1998—was an essential element, indeed the necessary predicate, to the closure of the bar and the seizure of its liquor inventory. Likewise, Daskalakis' initiation of the prosecution against plaintiff, which immediately followed the arrest, was based on this same collateral objective.

From the time it was designated a community "hotspot" by the NYPD, which occurred prior to June 12, 1998, *see supra,* the Oasis became a target premises for Conditions Unit, and MARCHS, visits. According to Daskalakis, it was Conditions Unit policy to enter establishments like the Oasis at night, and to remove liquor even when there was only "an issue as to the validity of the license." · (Tr. 173.) He further testified that he arrested plaintiff, in part, because "it was [his] belief that there was no license on the premises." (Tr. 139.) Thus, on the night of June 12, 1998, Daskalakis ignored plaintiff's explanations and her production of a seemingly valid liquor license, and, without any further inquiry as to the validity of the license, arrested plaintiff for forgery and seized the bar's liquor inventory. The principal justification Daskalakis offered for the arrest, namely, plaintiff's alleged attempt to defraud, was unreasonable. His alternative justification, that there was no license on the premises, does not justify an arrest; rather, it reflects the officer's collateral objective of closing down the bar. The Court therefore finds that, to support the closing of the Oasis and the removal of its liquor inventory, the police made an arrest, a felony arrest, of the presumed owner or manager of the Oasis,

rejecting evidence offered that, if properly verified, would have exonerated both plaintiff and the bar. Similarly, Daskalakis prosecuted this presumed plaintiff in order to further support such closing, and his unreasonable decision to arrest her on forgery charges. Because the prosecution was performed with an objective other than to punish plaintiff for forgery, criminal simulation and resisting arrest, such prosecution was performed with malice. Alternatively, the Court finds that probable cause for plaintiff's prosecution was "so totally lacking" as to justify an inference of malice. *Martin, supra,* 42 N.Y.2d at 17, 396 N.Y.S.2d 612, 364 N.E.2d 1304. Accordingly, the Court finds that plaintiff has proven by a preponderance of the evidence that Daskalakis maliciously prosecuted plaintiff on forgery, criminal simulation, and resisting arrest charges.

 While malicious prosecution concerns the improper issuance of process, malicious abuse of process involves the improper use of process after it is regularly issued. *See Cook, supra,* 41 F.3d at 80. Under New York law, a malicious abuse of process claim lies against a defendant who (i) employs regularly issued legal process to compel performance or forbearance of some act, (ii) with intent to do harm without excuse or justification, and (iii) in order to obtain a collateral objective that is outside the legitimate ends of the process. *See id.* (citing *Curiano v. Suozzi,* 63 N.Y.2d 113, 116, 480 N.Y.S.2d 466, 469 N.E.2d 1324 (1984)). In this case, while Officer Daskalakis acted with a collateral objective and wrongful purpose in prosecuting plaintiff and having her arraigned, *see Cook, supra,* 41 F.3d at 80 (stating that having plaintiff arraigned amounted to legal process), plaintiff introduced no evidence at trial that would support the position that Daskalakis acted with intent to do harm.[35] Accordingly, plaintiff has

---

**35.** On her motion for summary judgment, plaintiff sought to establish that Daskalakis acted with animus, because his sole motivation for arrest was to punish her for protest-

ing his seizure of the liquor licenses. (Memorandum Order date Oct. 19, 2000 at 9.) She relied on Daskalakis' deposition testimony that "[plaintiff's] actions dictated me" and

failed to establish a malicious abuse of process claim. *See Ben–Zaken v. City of New Rochelle,* 273 A.D.2d 426, 710 N.Y.S.2d 106, 108 (2d Dep't 2000); *Plataniotis v. TWE Advance/Newhouse Partnership,* 270 A.D.2d 627, 704 N.Y.S.2d 327, 331 (3d Dep't 2000).[36]

## IV. Municipal Liability

Plaintiff also contended that defendant The City of New York ("City") violated her constitutional rights. Specifically, plaintiff claimed that the City failed to adequately train, discipline, supervise, or otherwise direct the police officers of the Conditions Unit, and Officer Daskalakis in particular, concerning the laws related to their assigned duties, thereby causing Daskalakis to engage in wrongful conduct. (Amend Compl. ¶¶ 17–19; Pl. Pretrial Stmt. Claims at 7.)

## A. Legal Standard

■■■■ The mere fact that an officer, employee, or agent of a municipality deprived a plaintiff of a federal right is not itself a sufficient basis for holding the municipality liable to the plaintiff. According to the Supreme Court's decision in *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in order to establish the liability of a municipality in an action under Section 1983 for the unconstitutional acts by a municipal employee below the policymaking level, a plaintiff must establish that the violation of her constitutional rights resulted from a municipal custom or policy, that is, evidence that the municipality itself is at fault. *See Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995) (citing *Harris, supra,* 489 U.S. at 378, 109 S.Ct. 1197); *Tuttle, supra,* 471 U.S. at 823–24, 105 S.Ct. 2427. This "official-policy" requirement is intended to distinguish acts of the municipality from acts of its employees, so that municipal liability is limited to conduct for which the municipality is actually responsible. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 478–80, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Monell, supra,* 436 U.S. at 694, 98 S.Ct. 2018 ("A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.") The plaintiff must establish that the municipality either authorized the employee to act in violation of the plaintiff's rights, or was the "moving force" behind the violation. *See Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). Specifically, the plaintiff must prove that the City's action were taken (i) by express legislative grant, (ii) through delegation of policymaking authority by those to whom the power has been expressly granted, or (iii) by "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik,* 485 U.S. 112, 126, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (internal quotations omitted).

■■■■ The requisite municipal custom or policy may be established by reference to a single incident of unconstitutional activity if plaintiff shows that (i) the policy itself is unconstitutional, and (ii) was the cause of the constitutional violation. *See Tuttle, su-*

---

that "she brought [the arrest] upon herself," in arguing that her arrest was illegal and performed with malice. (*Id.*) The Court denied plaintiff's motion, citing case authority for the proposition that issues of knowledge or intent, because they arise on the basis of inferences drawn from the conduct of the parties, would be more appropriately established at trial. (*Id.*) (citing *Coolspring Stone Supply, Inc. v. Am. States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993)). In spite of the Court's direction, plaintiff failed to introduce any evidence at trial that could lead to the inference that Daskalakis arrested her with such animus, or with intent to do harm.

**36.** While malicious prosecution and malicious abuse of process claims are "closely allied," *see Cook, supra,* 41 F.3d at 80, establishing a collateral objective may be sufficient to establish malice for a malicious prosecution claim, but is not sufficient to establish malice for a malicious abuse of process claim. *See id.* at 78–80 (discussing the elements of each claim).

*pra,* 471 U.S. at 823–24, 105 S.Ct. 2427 (holding that proof of a single incident "is not sufficient to impose liability under *Monell* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker"); *id.* at 831, 105 S.Ct. 2427 (Powell, J., concurring) (To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict respondeat superior liability rejected in *Monell* ); *see also Dwares v. City,* 985 F.2d 94, 100 (2d Cir.1993); *cf. Pembaur, supra,* 475 U.S. at 484 & n. 11, 106 S.Ct. 1292 (holding that the policy which ordered or authorized an unconstitutional act can be established by a single decision by proper municipal policymakers). "At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *Tuttle, supra,* 471 U.S. at 823, 105 S.Ct. 2427. Where the alleged custom or policy is further removed from the constitutional violation, "the existence of the unconstitutional policy . . . must be separately proved." *Id.* at 824, 105 S.Ct. 2427. Also, where the policy is itself not unconstitutional, "considerably more proof than the single incident [alone] will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.*

■ One example of a municipal custom or policy that is not itself unconstitutional, but which through its application may still serve as a basis for liability under Section 1983, is the failure to train police officers. The Supreme Court has recognized that the inadequacy of police training may constitute Section 1983 liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom police come into contact." *Harris, supra,* 489 U.S. at 388, 109 S.Ct.

1197; *see also Dwares, supra,* 985 F.2d at 100. The presence of deliberate indifference in a failure to train case hinges on (i) whether the training program is adequate, (ii) whether the alleged inadequate training can justifiably be said to represent "city policy," and (iii) whether there is a close causal connection between the alleged failure to train and violation of constitutional rights. *See Harris, supra,* 489 U.S. at 390, 109 S.Ct. 1197; *id.* at 395, 109 S.Ct. 1197 (O'Connor, J., concurring). As the Supreme Court has explained, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390, 109 S.Ct. 1197. In such a case, the failure to provide proper training may represent a policy for which the city is responsible, and may be held liable if the application of the practice causes injury. *See id.* Further, "[while] predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances . . . judge and jury, doing their respective jobs, will be adequate to the task." *Id.* at 391, 109 S.Ct. 1197.

## B. Alleged Municipal Policies

In this case, in order to establish municipal liability, plaintiff presented evidence at trial as to the City's alleged custom or policy with regard to (i) the closing of a licensed premises without notice or hearing, and (ii) the training and supervision of police personnel.

### 1. Closing of a Licensed Premises

■ Testimony at trial established that it was it was the practice of the Conditions

Unit to close down designated community "hot spots" without any notice or hearing when there were questions as to the validity of the premises' liquor license. Following his description of plaintiff's arrest, his seizure of the Oasis' liquor license, and the removal of the bar's liquor inventory, Officer Daskalakis testified as follows:

> THE COURT: Just to conclude the subject of the taking of the liquor. Who authorized or directed the taking of the liquor from the premises?
>
> THE WITNESS: Sergeant Ferguson.
>
> THE COURT: Was that done while you were there? While you were on the premises you saw Sergeant Ferguson authorize it?
>
> THE WITNESS: I don't remember when it was done, when he authorized it. I know he authorized.
>
> THE COURT: And he authorized it when, after the arrest of Ms. Sulkowska?
>
> THE WITNESS: Yes.
>
> THE COURT: And effectively by removing the liquor from the premises, you were closing the premises, correct?
>
> THE WITNESS: Closing it from acting as a bar.
>
> THE COURT: Yes. And this was all being done without any hearing or notice to her that there was going to be a closing of the bar, correct?
>
> THE WITNESS: Yes.
>
> THE COURT: And you knew that the State Liquor Authority had procedures for notifying people who had licenses, or entities that had licenses, of violations that might lead to proceedings for the revocation of licenses, and the closing of their premises; you knew that?
>
> THE WITNESS: No sir, I didn't.
>
> THE COURT: You didn't know that as part of your training?
>
> THE WITNESS: They don't—they tell us what we are supposed to do and what we can do. And their administrative procedures.
>
> THE COURT: Was the removal of the liquor from the premises, as far as you understood, a standard procedure?
>
> THE WITNESS: Yes, sir ... It had been done at prior occasions, at different bars.

(Tr. 162–63.)

Daskalakis further testified that he and the other members of the 9th Precinct's Conditions Unit went to the Oasis as part of an SLA investigation on June 12, 1998 in order "to determine if [the bar] had a license" and adhered to the applicable SLA rules. (Tr. 100, 153). However, the same inquiry had purportedly been the subject of the visits from Conditions Unit officers on both June 4 and 6, 1998, when liquor had been removed and the bar was issued summonses for failure to display a liquor license and permitting consumption of alcohol without a liquor license.[37] Hearings were subsequently scheduled for July 1998, at which evidence regarding the license's validity was to be discussed. (Tr. 157, 237.) Nevertheless, the Conditions Unit officers did not allow these proceedings to run their course; and they made no effort before their return visit on June 12, 1998 to ascertain the existence and/or validity of the bar's liquor license. Despite the incomplete information concerning the location of the original license and its validity, the officers failed to inquire as to whether the license was still in safekeeping at the SLA, if it had been removed and by

---

**37.** The investigatory purpose of the Officers' June 12, 1998 visit is questionable. If, as defendants maintain, the SLA files were accurate and the license was in safekeeping as of June 4, 1998, (Def. Post–Trial Mem. at 20 & n. 4; Tr. 183), the purpose of the officers' June 12, 1998 visit could not logically have been to discover if the bar had a license. There was no testimony at trial that the license had been removed from safekeeping, or that there were any further findings as to the whereabouts or validity of the license, between June 4 and June 12, 1998.

whom, or if the license was in force and effect. Moreover, Daskalakis made no effort to further elucidate these issues when plaintiff presented him with the original license in the early morning of June 13, 1998; instead, the officer ignored the statement on the face of the license that it expired in 1999, and, relying on alleged statements from two other officers that the license had been revoked, arrested plaintiff and closed the bar. The officer's decision, taken in accordance with his standard practice, is indicative of an unconstitutional policy, given that Daskalakis arrested plaintiff and sanctioned the bar's closure when he merely "had a lot of doubt as to the validity of the license"; "[w]hether, in fact, that license was valid, I don't know. And I still don't know." (Tr. 153.)

The Court finds that it was the custom or policy of the NYPD's Conditions Unit to close licensed premises without notice or hearing and without checking with the SLA, the authorized state agency, to determine whether a target premises is operating without a license or with one that is not valid or in effect. By creating the MARCHS Task Force, delegating authority to the Commanding Officers of local police precincts to create lists of undesirable community locations as designated "hot spots", and authorizing the Conditions Unit to arrest people and close down those "hot spots" that were "real problems" without any notice or hearing, the City made an official decision constituting an act of government policy. See *Praprotnik*, *supra*, 485 U.S. at 126, 108 S.Ct. 915. Alternatively, the Court finds that the actions of the Conditions Unit in closing down such premises and appropriating their liquor inventory constitute a widespread custom or usage with the force of law. See *id.*

The City's custom or policy is unconstitutional, as it directly authorizes the police to disregard the due process rights of corporate and individual licensees, in violation of Fourteenth Amendment. See *Tuttle*, *supra*, 471 U.S. at 823–24, 105 S.Ct. 2427.

Moreover, the policy is affirmatively linked to the alleged constitutional violation in this case, namely plaintiff's false arrest on forgery charges, because plaintiff's arrest—like the arrest of other individuals at the Oasis on June 4, 1998 when the liquor inventory was also seized—was the vehicle through which the Oasis' closure was accomplished. See *id.* at 823, 105 S.Ct. 2427.

According to Daskalakis, it was Conditions Unit policy to enter targeted bar establishments at night, and to remove liquor even when there was only "an issue as to the validity of the license." (Tr. 173.) Part of Officer Daskalakis' justification in arresting was his belief, formed from talking to other officers of his team, "that there was no license on the premises" and that the license had been revoked. (Tr. 139, 150–51.) The officer's testimony indicates that on the night of June 12, 1998, he ignored plaintiff's explanations and her production of a seemingly valid license, and, in order to support the closing of the bar and seizure of its liquor, arrested plaintiff without any further inquiry. The police declined to consider any delay to allow the SLA proceedings to take place, or even until the following morning to allow a more complete inquiry with the SLA as to the license's validity. Instead, as part of his Unit's mandate from the City and in accordance with standard procedure, Officer Daskalakis took the most drastic action in disregard of the constitutional rights of plaintiff and of the corporate licensee. Daskalakis' actions were supervised and directed by a superior officer, Sergeant Ferguson, who was present and acting in accordance with NYPD standard procedure in furtherance of the overall policy initiated by the City's executive authority. (Tr. 162.)

## 2. Training of Conditions Unit Officers

Even if municipal liability were not established on the basis of the City's policy concerning the closing of targeted "hot spots" and the seizure of their liquor in-

ventory, the City would still be liable for its failure to properly train its officers concerning the ABC Law, the sections of the New York Penal Law directly implicated by the ABC Law, and SLA operations. According to the testimony of Officer Daskalakis, the relevant training of an officer in the Conditions Unit solely consisted of being presented with the SLA's law enforcement handbook, having sections of the handbook explained, and being instructed in the preparation of certain forms and summonses.[38] (Tr. 94, 99.) Officer Fernandez, called as a witness by plaintiff, testified that as a member of the Conditions Unit, he had "a couple of courses", not necessarily special training, on SLA laws and rules, as well as "some other training." (Tr. 199.) Officer Rosado testified that he received special training on SLA rules and regulations in a one-day course at the Police Academy. The training, as the officer described it, focused on "the rules they wanted us to enforce" and included having been shown "an original of

a liquor license" and "how to recognize a photocopy." (Tr. 444–45.)

Despite the fact that bar establishments often display photocopies of their valid liquor licenses,[39] Conditions Unit officers were not trained with regard to the ABC Law or the sections of the New York Penal Law related to the making or displaying of such photocopies. Under the ABC Law, and according to Hachmeyer's trial testimony, the mere making and displaying of such a photocopy is not a crime. (Tr. 41); ABC Law § 114.6 (stating that it is unlawful "knowingly to deface, destroy, or alter" a liquor license). Moreover, such display is not cause for a violation if the original license is displayed in a conspicuous manner. (Tr. at 41–42); ABC Law § 114.6 (stating that license "shall be posted up and at all times displayed in a conspicuous place in the room where such business is carried on"). Officer Rosado, however, testified as follows:

> THE WITNESS: That consisted of I was presented with the State Liquor Authority's law enforcement handbook, and sections of the handbook were explained to me. It was demonstrated for me the preparation of the forms that coincide with any action taken in a licensed or—in a licensed premise or premise that was supposed to be, that should have been licensed.
> *And did I say preparation of summonses?* And it was ongoing training. There were updates to the handbook or whatever. We were apprised of the updates.
> (Tr. 98–99) (emphasis added).

**38.** Officer Daskalakis' explanation of the entirety of his training was as follows:

> THE COURT: And at any time, either when you were first assigned to Conditions or when you were subsequently reassigned to Conditions, were you given any special training or education courses, or programs?
> THE WITNESS: Yes, sir.
> THE COURT: Tell us what training courses or programs you received and when they were.
> THE WITNESS: I can't remember when they were, but I received training from the Environmental Control Board with the use of sound meters, I had received training at the Police Academy with regards to SNEU.
> THE COURT: What do those letters stand for?
> THE WITNESS: Street Narcotics Enforcement Unit.
> THE COURT: What else, what other training or programs were you provided with?
> THE WITNESS: I trained in latent prints, which would be the identification and retrieving of latent fingerprints. I can't remember everything but—during unit training at the precinct I had been trained with regards to SLA matters.
> THE COURT: Tell us what that training consisted of.

**39.** According to Hachmeyer, it is not uncommon for proprietors to make photocopies of liquor licenses, and some of them "place it in the window of the licensed premises so that the local police officer on the beat can see an [sic] copy of a liquor license." (Tr. 41.) Officer Fernandez testified that he had often seen color photocopies of liquor licenses displayed and had not issued a summons on those occasions, because "[t]hey are allowed to have a photocopy of their license, as long as the actual, the real license is on display somewhere in the bar, conspicuously." (Tr. 213.) Rosado and Daskalakis testified that they had not seen color photocopies displayed in bars. (Tr. 178–79, 444.)

THE COURT: Now, let's go back just a few moments. I think in your examination by Ms. Rossan, [Assistant Corporation Counsel], you mentioned that as part of the MARCHS Task Force there were representatives of the SLA there?

THE WITNESS: Yes, sir.

THE COURT: I believe you mentioned that one of those representatives was a gentleman by the name of Hachmeyer, correct?

THE WITNESS: Correct.

THE COURT: And that is Philip Hachmeyer, correct?

THE WITNESS: I don't know his name.

THE COURT: He is an SLA investigator?

THE WITNESS: That could be, yes, sir.

THE COURT: Mr. Hachmeyer, who has also appeared here, stated that he was an SLA investigator for at least 15 years, and he said that there is no violation to have a photocopy of a license displayed. Are you aware of that, the fact that that is what the law is? It's not a violation of law to have a photocopy of a license displayed. Do you know that?

THE WITNESS: A photocopy of a license?

THE COURT: Yes.

THE WITNESS: According to the New York State Penal Law, that I—from what I have known, that would constitute a forgery.

THE COURT: That is a forgery to have a copy?

THE WITNESS: Copy of a governmental document.

THE COURT: Did he not tell you— were you trained to believe that?

THE WITNESS: By the Police Department.

THE COURT: Is that what the training in the Police Department told you?

THE WITNESS: Yes, sir.

(Tr. 472–73.) [40] Similarly, Daskalakis testified as follows:

THE COURT: You mean, making a copy of a document, such as the [liquor] license, and saying this is the license, and handing it to you is a forgery?

THE WITNESS: Yes.

(Tr. 146.) Daskalakis also stated at trial that he was not aware that there is a section of the New York Penal Law that contains definitions of the terms contained in the substantive sections of the statute, specifically those relating to forgery. (Tr. 142; NYPL § 170.00.)

Further, testimony at trial established that NYPD officers receive little or no training in the laws or proper procedures associated with closing a premises and the seizure of its inventory. As discussed *supra*, it was the "standard procedure" of the Conditions Unit to appropriate liquor inventory and close down "target" premises without any notice or hearing, and, because inspections were performed late at night or in the early morning, it was standard practice not to check with the SLA concerning the validity of a liquor license before closing down a target location. (Tr. 161–63, 173.) Officer Rosado testified that his training did not include instruction on how to check or investigate whether a liquor license had been canceled, suspended, or revoked, and that he had never called the SLA to determine that fact. (Tr. 482–83.) Officer Fernandez testified that in order to make that determination, he would "ask whoever I was working with, or ask my supervisor for their opinion." (Tr. 208.) Further, no officer stated that he had received training with regard to a licensee's rights, specifically the right to due process, or with regard to SLA procedures for notifying licensed entities

---

**40.** Rosado also testified that he did not know that it is not a violation to have a photocopy displayed if the original liquor license is conspicuously displayed. (Tr. 474.)

of violations that could lead to revocation proceedings or the closure of their premises. (Tr. 162–63.) As Daskalakis stated, "[the SLA] tell[s] us what we are supposed to do and what we can do. They don't tell us what they do. And their administrative procedures." (Tr. 163.)

Given that the photocopying of liquor licenses is a frequent practice of New York bar owners, the failure of the NYPD or the SLA to properly train members of the Conditions Unit with regard to laws related to the forgery of liquor licenses is evidence of the City's deliberate indifference to the rights of licensees and bar employees, such as plaintiff in this case, with whom the officers come into contact. The same is true, although to a lesser degree, with respect to officers' training concerning the proper procedures for closing down a premises.[41] The Court finds that the need for more and adequate training concerning these two areas should have been obvious to the City in light of the duties of the officers of the Conditions Unit, such that the City may reasonably be said to have been deliberately indifferent to this need. *See Harris, supra,* 489 U.S. at 390, 109 S.Ct. 1197.

The New York State Legislature has mandated that regularly appointed police officers be exposed to an exacting training program, *see* New York General Municipal Law § 209–q, consisting of no less than 510 hours of coursework and covering such topics as the "administration of justice" and "basic law," *see* 9 Official Compilation of Codes, Rules, and Regulations of the State of New York ("NYCRR") § 6020.3(a) (McKinney's 2000). The legislature has further prescribed that the specific time allotment for the listed categories and respective titles/topics are to be established

by the Police Council and published by the Police Commissioner. *Id.* In New York City, the training school for new police recruits provides several hundred more hours of training in a wide variety of areas, including police science and law. *See People v. Rosario,* 78 N.Y.2d 583, 592, 578 N.Y.S.2d 454, 585 N.E.2d 766 (1991) (Titone, J., dissenting) (citing Police Department of City of New York, Commanding Officer of Police Academy, *Memorandum re: Police Officer Training,* DCTr. No. 667–91 (Sept. 30, 1991)). The law curriculum is designed to provide officers "with a working knowledge of criminal and procedural law" through, *inter alia,* the use of workshops and films. *Id.*

The training program at the Police Academy and police precincts for Conditions Unit members, as described by the officers who testified at trial, is inadequate, because it fails to provide training in some of the most basic laws implicated by the officers' duties. This training program constitutes "city policy"; if not prescribed by express legislative grant, the program is established through the delegation of City policymaking authority, and instruction is provided by the NYPD, the SLA, and other City agencies. *Cf. Praprotnik, supra,* 485 U.S. at 126, 108 S.Ct. 915. Further, plaintiff's arrest is a consequence flowing directly from such inadequate training, because it resulted from (i) Officer Daskalakis' misapplication of the New York Penal Law provisions related to forgery, which arose from his ignorance of the statute, and (ii) his application of an unconstitutional policy related to the closure of premises, which itself resulted from the Conditions Unit officers' inadequate training in SLA operations.[42]

---

**41.** The City's failure to train the officers in this regard, although inexcusable, is understandable, given that the City itself authorizes these activities as the standard practice of the Conditions Units and the MARCHS Task Force. The City's ability to perceive the inadequacy of the training, therefore, is severely circumscribed.

**42.** Daskalakis' action in arresting plaintiff and sanctioning the seizure of liquor was apparently based on his mistaken beliefs that (i) making a photocopy and presenting it to an officer amounts to the crime of forgery under New York law, and (ii) the Oasis' license itself was invalid. As noted *supra,* his conclusion that plaintiff attempted to pass off the license

## INJURIES AND DAMAGES

### A. Injuries

In the Complaint, plaintiff claims that she suffered "physical injury" as a result of her arrest and detention. The only evidence of physical injury that plaintiff presented at trial, however, was her testimony that (i) her hands were hurt and were swollen from the application of the handcuffs during her detention, and (ii) her legs were swollen upon her transfer to central booking.[43] (Tr. 378–80.412.) Plaintiff submitted no documentation at trial showing physical injuries, and her alleged injuries were contradicted by the testimony of Skamalos, the examining EMT, who stated that plaintiff did not complain of swollen wrists, only of general malaise, nor did he observe that she had swollen wrists. (Tr. 491; Def. Ex. B–2.) Plaintiff's alleged physical injuries also contrast with the Bellevue records, which indicated no physical problems other than an undefined "heart" problem which plaintiff related.[44] (Def.Ex. B–1.) Accordingly, the Court finds that plaintiff suffered no physical injuries as a result of her arrest and subsequent detention.

However, plaintiff did suffer significant emotional injury which has required treatment. The Court first notes that in the determination of the monetary damages to be awarded to the plaintiff for the emotional distress sustained as a result of her arrest, it must be careful not to compensate the plaintiff for any distress unrelated to her arrest. At times prior to her arrest and detention on June 12, 1998, plaintiff had been depressed. Her husband's death in the 1980s caused her significant anxiety.

(Tr. 291, 382–83.) She stated to a doctor in 1992 that she remained depressed about her husband's death and worried that her daughters were being mistreated by their respective husbands; she also complained of the inability to sleep. (Def.Exs.B–5, B–12, B–13.) Moreover, in 1994, plaintiff had an operation to remove a brain tumor. (Tr. 264–65; Def. Exs. B–10, B–15.)

Plaintiff asserted that on the night of her arrest, she suffered humiliation and embarrassment, specifically from being arrested and led out of the bar in the presence of patrons, (Tr. 318; Def. Ex. LLL ¶ 14; Def. Ex. G at 1), from being led through the hospital in handcuffs, (Tr. 378–79), and being placed in the cell at central booking with other, younger detainees, who insulted her, (Tr. 380). Such humiliation caused her to feel that she "couldn't hide"; she "wanted to be dead ... [and] didn't know what to do." (Tr. 379.) However, the extent of plaintiff's emotional injury was not apparent during the course of her arrest or even in the period immediately following her release. Although plaintiff cried and/or screamed during the course of the arrest, while at the 9th Precinct, and during her transport to Bellevue, Skamalos observed that plaintiff merely "refused to cooperate" with the medical unit and reported that she didn't feel well. (Def.Ex. B–2.) Similarly, the doctors at Bellevue determined that although plaintiff was in a bad mood, she was not in need of psychiatric treatment. (Def. Ex B–1; Tr. 308–11.) Daskalakis testified that during the course of the night, plaintiff appeared angry but not vi-

was not objectively reasonable, and the Court declines to credit his testimony in this regard.

**43.** Plaintiff also testified that she could not breathe because "something happened to my blood pressure." (Tr. 412.) The Court declines to consider this injury because it is imprecise and was not reflected in the medical examinations subsequently performed by the EMTs or by the doctors at Bellevue.

**44.** Dr. Harold Appel ("Dr.Appel"), a neurologist produced by plaintiff, testified that plain-

tiff had a transient ischemic attack or TIA, which is similar to a stroke, approximately three months after the incident in question, and opined that the attack had no relation to plaintiff's arrest and subsequent detention on June 13, 1998. (Tr. 348–49, 351–52.) He further testified that he treated plaintiff for headaches after the date of her arrest, but did not believe that the headaches were caused by the arrest or surrounding events. (Tr. 351.)

sibly terrified. (Tr. 193.) Barbara testified that plaintiff simply "was very upset" when she spoke to her on June 13, 1998, and "wanted to just rest and sleep." (Tr. 236.) However, plaintiff testified that, after arriving home on the afternoon of June 13, 1998, she was afraid that someone would shoot her. (Tr. 381.)

Dr. Lowell Anderson ("Anderson"), a psychologist of 30 years currently affiliated with Bellevue, was called as a witness by plaintiff. Anderson is an associate professor in the Psychiatry Department of New York University Medical Center and is in charge of Bellevue's Behavior. Medicine Health Psychology Program. (Tr. 271.) Anderson testified that plaintiff was referred to him for treatment by her primary care physician in fall 1999, because plaintiff had been complaining of insomnia. (Tr. 273, 275, 287.) His initial psychological evaluation focused specifically upon the effect of plaintiff's arrest and detention, as plaintiff immediately began to recount the events of June 12 and 13, 1998. (Tr. 276.) Anderson testified that he found plaintiff's account believable, and concluded that plaintiff was suffering from post-traumatic stress disorder ("PTSD"). (Tr. 276.) In particular, he determined that plaintiff (i) had been exposed to a trauma involving intense fear or helplessness; (ii) had been re-experiencing the event, for example, through flashbacks, nightmares, or by seeing the police in places where they were not, which was evidenced in part by physiological respiratory increases in heart rate and sweating; (iii) was avoiding certain things, such as the precinct house, associated with the event; (iv) had demonstrated symptoms of increased arousal, including the inability to sleep and difficulty concentrating; and (v) had a sense of a foreshortened future because happiness would no longer be possible for her. (Tr. 276–78, 323.) These symptoms caused "significant clinical impairment," in particular social avoidance, and have continued and not abated.[45] (Tr. 278–79, 381, Def. Ex. LLL ¶¶ 21–22.) Anderson testified that plaintiff suffered a serious injury, "has not gotten better" although she improved at the beginning, "[her condition] has been very hard on her," and her treatment will be ongoing for the foreseeable future. (Tr. 279–80, 340.)

In their post-trial damages memorandum, defendants asserted that Anderson's methodology, and plaintiff's failure to disclose certain facts to the doctor, "calls into question Dr. Anderson's diagnosis of PTSD." (Def. Post–Trial Mem. at 9.) The Court disagrees, and finds Anderson's diagnosis of PTSD to be credible.[46] On cross-examination, the doctor conceded that, in his initial examination, he asked plaintiff some closed-ended questions with regard to her symptoms, arrived at a tentative diagnosis of PTSD quickly without having looked at plaintiff's medical records, and failed to take notes concerning the details of certain symptoms. (Tr. 285–86, 288–91, 294–95, 301–02, 312–13, 322–23, 325, 335–36.) However, Anderson has seen plaintiff 13 more times since the initial visit, has since examined her medical history, was sure of his diagnosis after spending two-and-one-half hours with plaintiff, and stated that his diagnosis "will

**45.** Anderson also testified that a delayed onset of symptoms is common in PTSD patients, with such delay being months or years. (Tr. 341.) This may explain why plaintiff did not demonstrate psychological trauma on the night of the incident, or even shortly thereafter, a point accented by defendants at trial. (Tr. 307–08.)

**46.** Defendants produced no expert on the issue of plaintiff's injuries. Defendants made a belated demand, several months after the close of discovery, for the appointment of an expert, which was denied by the Court. The fact that Dr. Anderson's conclusions concerning plaintiff's emotional injuries were uncontroverted provides additional support for these conclusions. *See, e.g., Blondin v. Dubois*, No. 00–6066, 2001 WL 40566, at *6 (2d Cir. Jan. 4, 2001) (emphasizing "the absence of any contravening evidence" in affirming plaintiff's medical expert's conclusions as to the existence of PTSD and its effect on the psychological well-being of defendant's children).

not change." (Tr. 279, 332, 339.) While plaintiff does not exhibit all the possible symptoms of PTSD, Dr. Anderson made his determination on the basis of his lengthy examination of plaintiff, and in accordance with the symptom categories listed in a prominent diagnostic manual published by the American Psychiatric Association, called *Diagnostic & Statistical Manual of Mental Disorders* (4d ed. 1994) ("DSM IV").[47] (Tr. 277–79, 323; Def. Ex. FFF.) Further, the doctor specifically ruled out other conditions and influences in arriving at his current conclusion regarding plaintiff's condition. In particular, he stated that (i) he has seen no evidence of previous psychiatric disorders, (ii) plaintiff does not appear to have Alzheimer's Disease, in part because plaintiff is lucid when discussing subjects other than her arrest, and (iii) there is no linkage between plaintiff's PTSD symptoms and plaintiff's history of insomnia and depression surrounding the death of her husband, her 1994 brain surgery, or her advancing age. (Tr. 281–82, 291–94, 297–98, 304–07.)

Plaintiff's testimony also indicated that the emotional injury she has suffered is intense and pervasive. She testified that she remains constantly afraid that someone is coming to kill her, and never goes to bed without checking all the doors and looking in corners, under the bed, and in the closet. (Tr. 381–82.) She sees a "picture" of the events of the night of her arrest "all the time." (Tr. 414.) Moreover, the fact that she has not gotten better seems to have resulted in further depression. (Def.Ex. G.) Plaintiff's emotional injury appears to be particularly acute in her case because of her background. Plaintiff testified that she feels

afraid of the police for the following reason:

"Because, because, you know, I came over here to this country because I—you know, I wanted my, me and my daughters be free. And then I did everything, it was very hard to go from Poland and to go to Germany, but I did everything to get the permission, get the passport, you know. And it cost me much time. And my health, you know, to do this ... You know, I know that you know we pay so high price for, you know, the liberty over here, for me and my daughters, and my husband paid so high, you know, price ...." (Tr. 382–83).

While she continues to work regularly at the Oasis, plaintiff testified that she is performing less work at the bar than she did before the arrest. (Tr. 420–21.) She stated that she is afraid of the police, tries to avoid them, and has not been able to visit the 9th Precinct. Plaintiff acknowledged that she attended the depositions of each of the officers deposed in this lawsuit, and Officers Daskalakis, Fernandez, and Rosado all testified that plaintiff did not appear to be terrified or upset during the examinations. (Tr. 194, 212, 451–52.) Rosado further testified that plaintiff did not run away from police officers who visited the bar as part of the MARCHS Task Force visit in November 1999, and that plaintiff grabbed a police sergeant's arm to ask him a question during a subsequent investigation in April 2000 for a noise complaint. (Tr. 448–50.) However, Dr. Anderson testified that as part of plaintiff's continuing treatment, he and his colleagues "have been encouraging her to go and be with the police." (Tr. 320.) He also testified that, in her final session before the trial, he had trouble convincing plaintiff to attend, "because she was afraid the police would see her and kill her." (Tr.

**47.** Anderson stated that because plaintiff recalled everything that happened on the night of her arrest, she failed to satisfy one subset of the criteria of persistent avoidance, the "inability to remember aspects of the event." (Tr. 278.) But according to DSM IV, an individual need not exhibit all possible symptoms to qualify for a PTSD diagnosis. (Def.Ex. FFF.); *see also In re Air Crash Disaster at Charlotte, North Carolina on July 2, 1994,* 982 F.Supp. 1101, 1107 (D.S.C.1997) (reporting doctor's testimony that different individuals have alternate ways of exhibiting PTSD).

327.) Finally, despite the fact that he had given plaintiff a letter in case she wanted to sue, Anderson stated that he determined that plaintiff was not malingering, on the basis of her conflicting feelings concerning the pursuit of litigation and her expressed mistrust of the American legal system.[48] (Tr. 327–29, 331; Letter of Lowell T. Anderson, Ph.D. dated Nov. 10, 1999, Def. Ex. R; Def. Ex. G at 5.) The Court's observations of plaintiff at trial accord with the account given by plaintiff and Dr. Anderson; in particular, she was emotionally upset while recounting the events of June 12 and 13, 1998, crying at certain junctures, and appeared to have severe problems concentrating throughout her testimony.

Further, Barbara testified that from a certain point following the arrest, plaintiff has been "in shock . . . very stressed out. Very anxious." (Tr. 236.) The records of Dr. Appel, for plaintiff's visits in late 1998 and early 2000, reflect that she described her wrongful arrest to him, that she "was tearful and depressed," that "she had fear of [the events] happening again," and was "preoccupied with [the events] by her own admission." (Def.Ex. B–16.)

Accordingly, the Court finds that plaintiff has proved, by a preponderance of the credible evidence, that, during her arrest and subsequent detention, she was humiliated, and that as a result of such arrest, sustained a post-traumatic distress disorder, with accompanying symptoms of depression, anxiety, fear, and disturbed sleep, to the present date.

## B. Damages

### 1. Compensatory Damages

■ The law provides that damages may be awarded for false arrest only from the period from initial custody through arraignment, and damages may be awarded for malicious prosecution for injuries suffered following arraignment. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 117 (2d Cir.1995) (citing W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 119, at 888 (5th ed. 1984) ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim . . . .")); *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir.1992); *Williams v. Moore*, 197 A.D.2d 511, 602 N.Y.S.2d 199, 202 (2d Dep't 1993). In this case, damages for malicious prosecution specifically will be minimal, because the injuries of which plaintiff complains principally surround the event of her arrest and prearraignment detention. Plaintiff was released from custody following her arraignment and had only one further hearing, the September 2, 1998 proceeding where the charges were dismissed. Further, plaintiff presented no evidence at trial, or in her post-trial damages memorandum, concerning any actual pecuniary losses she has suffered as a result of her arrest and subsequent detention, or any of her expenses. There was, for instance, no testimony that she could no longer work, and she presented no cost estimates with regard to her continuing psychiatric treatment or other medical expenses.[49] Thus, in its discussion of compensatory damages, the Court focuses on plaintiff's emotional distress damages incurred from the time of plaintiff's arrest to her release from custody.[50]

■ "When Section 1983 plaintiffs seek damages for violations of constitutional

---

**48.** The fact that Anderson gave plaintiff this letter approximately five months after plaintiff filed this action, and without knowing that she had filed suit, is immaterial to his diagnosis. (Tr. 329–30.)

**49.** Plaintiff, in her post-trial damages memorandum, stated that she is taking certain medications for her condition. (Pl. Post–Trial Mem. at 3.) However, no cost figures were provided.

**50.** The damages for Daskalakis' assault and battery on plaintiff, which occurred during the course of her arrest, are also encompassed by this analysis.

rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 306, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (citing *Smith v. Wade*, 461 U.S. 30, 34, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). Compensatory damages are damages grounded in determinations of plaintiff's actual losses caused by the deprivation of her constitutional rights and "may include not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation ... personal humiliation, and mental anguish and suffering." *Id.* at 307, 106 S.Ct. 2537 (citations and internal quotations omitted).

The measure of damages for pain and suffering or emotional distress is the fair and reasonable compensation to be fixed by the trier of fact in the light of all the evidence in the case. *See Mileski v. Long Island R. Co.*, 499 F.2d 1169, 1172 (2d Cir.1974); *Mathie v. Fries*, 935 F.Supp. 1284, 1304 (E.D.N.Y.1996) ("*Mathie I* "). Unlike pecuniary losses, these damages are, by their nature, not easily translated into a dollar amount. *See Mathie v. Fries*, 121 F.3d 808, 814 (2d Cir. 1997) ("*Mathie II* "). Consequently, the law does not provide a precise formula by which pain and suffering and emotional

distress may be properly measured and reduced to monetary value.

In this case, quantifying plaintiff's pain and suffering is particularly difficult, because, with the exception of the humiliation that occurred during the arrest, (i) plaintiff's suffering has occurred over the two-and-one-half years since the time of her arrest, and (ii) while it is indisputable that plaintiff's distress which is manifested as PTSD will remain with her for a substantial period of time, the length of this period is unknown and there are questions as to the degree to which the plaintiff will be able to cope with her trauma in the interim. Nevertheless, it is obvious to the Court that the emotional injury that plaintiff has endured has been severely limiting, even debilitating at times, and will be a significant factor in plaintiff's life for the foreseeable future. Thus, having considered the relevant testimony, including plaintiff's testimony and the testimony of Dr. Anderson, who specializes in the study and treatment of PTSD and other psychological injuries, the Court concludes that plaintiff has been severely, and perhaps permanently, injured. Based on the foregoing, and on awards of emotional distress damages in similar cases,[51] in particular those involving false arrest or other police misconduct,[52] and PTSD,[53] *see Mathie II*,

---

**51.** The Court considers the reasonableness of the damages award under both federal and state law, because defendants are liable to plaintiff on both federal and state claims.

**52.** *See, e.g., Bender v. City of New York*, 78 F.3d 787, 792 (2d Cir.1996) (awarding $150,000, reduced from $300,000 upon jury verdict, arising out of a false arrest and malicious prosecution, where plaintiff's injuries consisted essentially of a minor blow to the mouth, 24 hours' confinement, the pendency of criminal charges for six months, and some "nightmares and occasional loss of sleep"); *Gardner v. Federated Dep't Stores*, 907 F.2d 1348, 1354 (2d Cir.1990) (sanctioning award of $200,000, $50,000 for deprivation of liberty and $150,000 for past pain and suffering, where plaintiff was falsely arrested and held in custody for approximately eight hours, sustaining an injury to the jaw and emotional distress); *Hughes v. Patrolmen's Benevolent*

*Assoc.*, 850 F.2d 876, 879, 884 (2d Cir.1988) (awarding $225,000 in emotional distress damages to a police officer harassed by fellow officers, where no permanent harm resulted); *Komlosi v. Fudenberg*, 2000 WL 351414, *13–16 (S.D.N.Y. Mar. 31, 2000) (awarding plaintiff $500,000 for non-economic loss arising out of false arrest and sexual harassment, where plaintiff psychologist was incarcerated for two weeks, required years of psychiatric treatment, and was so concerned about the possibility of the recurrence of false allegations that he was unable to resume his career); *Martinez v. Gayson*, No. 95 CV 3788, 1998 WL 564385, at *6 (E.D.N.Y. June 30, 1998) (remitting award of compensatory damages from $310,000 to $160,000 in false arrest case where plaintiff suffered no physical injuries, only some humiliation, and was in custody for approximately five hours); *Bert v. Port Authority of New York and New Jersey*, 166 A.D.2d 351, 561 N.Y.S.2d 416, 417 (1st

*supra*, 121 F.2d at 813 (noting that damage determinations should not be made in a vacuum), the Court finds that defendants are liable, jointly and severally, in the amount of $275,000 for the emotional injuries that plaintiff has sustained as a result of her arrest. This award applies to plaintiff's past and future pain and suffering.

## 2. Punitive Damages

The purpose of punitive damages is "to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis, supra*, 477 U.S. at 307 n. 9, 106 S.Ct. 2537. Punitive damages are available in Section 1983 cases, but only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Punitive damages are not available from a municipality. *See Jefferson v. City of Tarrant*, 522 U.S. 75, 79, 118 S.Ct. 481, 139 L.Ed.2d 433 (1997) (citing *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)).

In this case, there was no evidence presented at trial that would indicate that Daskalakis acted with evil intent. However, the Court finds that Daskalakis acted with reckless disregard for plaintiff's rights in falsely arresting and maliciously prosecuting her, in order to serve the collateral objective of the closure of the Oasis bar. Such recklessness calls for the type of deterrence that punitive damages are designed to provide.[54]

Dep't 1990) (awarding $100,000 to plaintiff for emotional distress where he was wrongfully detained by police officers for approximately three hours and humiliated before his young child); *Orndorff v. De Nooyer Chevrolet, Inc.*, 117 A.D.2d 365, 503 N.Y.S.2d 444, 447–48 (3d Dep't 1986) (affirming $50,000 for false arrest where plaintiff was held in custody for 12 hours and ridiculed in a newspaper); *cf. Vitale v. Hagan*, 132 A.D.2d 468, 517 N.Y.S.2d 725, 726 (1st Dep't 1987) (affirming award of $750,000 for malicious prosecution arising out of an altercation between a motorist and police sergeant as a result of which plaintiff was charged with assault and resisting arrest).

**53.** *See, e.g., Mathie II, supra*, 121 F.3d at 813–15 (upholding $250,000 in compensatory damages, including emotional damages arising out of PTSD, for sexual attack on plaintiff inmate by defendant security guard, with a reduction on account of the fact that his distress was caused in part by his participation in a murder for which he was incarcerated); *Schneider v. Nat'l Railroad Passenger Corp.*, 987 F.2d 132, 137–39 (2d Cir.1993) (upholding jury verdict of $1.75 million including approximately $1 million in "intangible damages" to compensate plaintiff for PTSD, depression, and organic brain syndrome arising out of physical attack); *Smith v. Kmart Corp.*, 177 F.3d 19, 30–32 (1st Cir.1999) (upholding jury verdict of $500,000 for non-economic damages to plaintiff, specifically physical injury and emotional injury as a result of PTSD and loss of enjoyment of life, arising out of

injury suffered in a department store); *Ruiz v. Gonzalez*, 929 F.2d 31, 34–35 (1st Cir.1991) (upholding $350,000 award for past and future damages when there was evidence that plaintiff was diagnosed with PTSD and suffered a partial disability as a result of beating by police, although a portion of the award could have represented lost future earnings); *In re Air Crash, supra*, 982 F.Supp. at 1106 (awarding $220,000 in damages for emotional injury for PTSD arising out of trauma suffered as a result of an airplane crash); *Webb v. Hyman*, 861 F.Supp. 1094, 1116 (D.D.C. 1994) (affirming jury verdict of $300,000 in emotional distress damages against city and corrections officer for sexual assault, where assaults resulted in PTSD); *Roundtree v. City*, 208 A.D.2d 407, 617 N.Y.S.2d 170, 171 (1st Dep't 1994) (upholding $200,000 damages award for emotional distress damages, taking into account the "unremarkable circumstances of plaintiff's [false] arrest," his detention, the publicity attendant to the arrest, and evidence of PTSD); *Byrd v. New York City Transit Auth.*, 172 A.D.2d 579, 568 N.Y.S.2d 628 (2d Dep't 1991) (reducing $950,000 jury verdict for compensatory damages to $250,000, where plaintiff suffered injuries in the form of minor scarring and "there was some indication that plaintiff suffered from post-traumatic stress disorder" arising out of false arrest by police).

**54.** While plaintiff's counsel represented to the Court at the close of trial that he "didn't think he was looking for" punitive damages, (Tr. 502), plaintiff's post-trial damages memoran-

In determining the amount of punitive damages, the Supreme Court has recently identified three "guideposts" that bear on the reasonableness of such awards, at least the outer limits imposed by the Due Process Clause, *see BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), which have subsequently been relied on by the Second Circuit in reviewing punitive damages awards, *see Mathie II, supra,* 121 F.3d at 816. These guideposts are: "(1) the degree of reprehensibility of the tortious conduct, (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* (noting that, for the third element, the relevant comparison is with both civil and criminal penalties.) The ultimate goal is "to make 'certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.' " *Lee v. Edwards,* 101 F.3d 805, 809 (2d Cir. 1996) (quoting *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992)). Several courts have upheld punitive damages awards in cases similar to the instant one.[55]

Having considered the totality of the evidence, including the nature and circumstances of the officer's tortious conduct, the principles of law set forth above, and the need to punish the defendant and de-

ter others from acting in a similar manner, the Court assesses punitive damages against Officer Daskalakis in the amount of $7,500.

### 3. Attorneys Fees

In Section 1988 of the Civil Rights Act of 1871, 42 U.S.C. § 1988(b), Congress provided that the Court, in its discretion, may allow a prevailing party in a Section 1983 action to recover attorneys fees as an element of costs. *See Bonner v. Guccione,* 178 F.3d 581, 597 (2d Cir.1999). The Court orders plaintiff's counsel to provide the Court, within 14 days from the date of this Opinion, with an affidavit (i) identifying the fee arrangement his office has with plaintiff, and, if available, the applicable hourly rates, and (ii) containing time records which itemize in detail the hours when work was performed on the case and the subject of the work performed.

### CONCLUSION

For the foregoing reasons, the Court finds (i) that Officer Daskalakis is liable to plaintiff for false arrest, assault and battery, and malicious prosecution, and (ii) that the City is liable to plaintiff for maintaining a policy and practice that resulted in the violation of plaintiff's constitutional rights. The Clerk of the Court is directed to enter judgment in favor of plaintiff against defendants, jointly and severally, in the sum of $275,000 for compensatory

---

dum asserts punitive damages as they are plead in the Amended Complaint. (Pl. Post-Trial Mem. at 5–6.)

**55.** *See, e.g., King v. Macri,* 993 F.2d 294 (2d Cir.1993) (awarding $150,000, reduced from $250,000 to plaintiff held in pretrial detention for two months at Rikers Island as a result of a malicious prosecution, suffering physical and psychological injury); *Ismail v. Cohen,* 899 F.2d 183, 185, 187 (2d Cir.1990) (awarding $150,000 to plaintiff who was severely beaten by police officer, placed in jail for 60 hours, and wrongly charged with several offenses, suffering physical and psychological injury); *Lee, supra,* 101 F.3d at 812–13 (awarding $75,000, reduced from $200,000 for malicious prosecution and assault and bat-

tery, where plaintiff suffered some physical injury and was confined for a few hours); *Martinez, supra,* 1998 WL 564385, at *3 (affirming jury award of $10,000 punitive damages in case involving false arrest and malicious prosecution for two misdemeanors and a violation, where plaintiff was confined for five hours and suffered no injuries); *Davis v. McGlaughlin,* No. 82–CV–2727, 1989 WL 47699, at *2 (E.D.N.Y. Apr. 28, 1989) (awarding $30,000 to plaintiff for malicious prosecution by corrections officer); *Papa v. City of New York,* 194 A.D.2d 527, 598 N.Y.S.2d 558, 563 (2d Dep't 1993) (reducing award to $500,000 in case involving assault and battery where officers opened fire on plaintiffs and beat them, causing substantial physical injury, false arrest, and malicious prosecution, including being handcuffed to a pipe).

damages, and against Officer Daskalakis individually in the sum of $7,500 for punitive damages, suffered as a result of plaintiff's arrest and detention on June 12 and 13, 1998.

SO ORDERED.